301 Ga. 694
FINAL COPY

S17A0714.  BATTLE v. THE STATE.
S17A1301.  CARTER v. THE STATE.

HINES, Chief Justice.

Co-defendants Marcus Battle and Jacobey Carter appeal their convictions

and sentences for malice murder and felony murder, respectively, and multiple

counts of aggravated assault with a deadly weapon, aggravated battery, and

possession of a firearm during the commission of a felony, all in connection

with the fatal shooting of Kenneth Roberts and the wounding or assault with

handguns of five other men.  Additionally, Carter appeals his related conviction

and sentence for possession of a firearm by a convicted felon.  Battle contends

that the State committed a *Brady*[1] violation, that the office of the district

attorney should have been disqualified in his case, and that his trial counsel was

ineffective.  Carter's sole challenge is that the evidence was insufficient to

support his convictions. For the reasons that follow, we find the challenges to

---

[1] *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963).

be unavailing and we affirm the convictions and sentences of both men.[2]

The evidence construed in favor of the verdicts showed the following. On

[2]The crimes occurred on September 7, 2012. On March 22, 2013, a Fulton County grand jury indicted Battle and Carter jointly with Robert Harris: Count 1 – the malice murder of Roberts; Count 2 – the felony murder of Roberts while in the commission of aggravated assault; Count 4 – the aggravated assault with a deadly weapon of Roberts; Count 5 – the aggravated assault with a deadly weapon of Jearmain Finch; Count 6 – the aggravated assault with a deadly weapon of Walter Williams; Count 7 – the aggravated assault with a deadly weapon of Travron Gill; Count 8 – the aggravated assault with a deadly weapon of Kyle Pope; Count 9 – the aggravated assault with a deadly weapon of Kevin Brittain; Count 10 – the aggravated battery of Jearmain Finch; and Count 11 – possession of a firearm during the commission of a felony. Additionally, in the 13-count indictment, Carter and Harris were jointly charged with felony murder while in the commission of possession of a firearm by a convicted felon (Count 3), and individually charged with possession of a firearm by a convicted felon (Counts 12 and 13). Battle and Carter were tried before a jury jointly with Harris September 22-29, 2014. Battle was found guilty on all charges; Carter was acquitted of malice murder but found guilty on all remaining charges.

Battle was sentenced to life in prison without the possibility of parole for malice murder (Count 1), concurrent terms of 20 years in prison for the aggravated assaults with a deadly weapon (Counts 5-9) and for aggravated battery (Count 10), and a suspended five years in prison for possession of a firearm during the commission of a felony (Count 11). The verdict on Count 4 merged with Count 1 for the purpose of sentencing, and the verdict on Count 2 stood vacated by operation of law.

Carter was sentenced to life in prison without the possibility of parole for felony murder (Count 2); concurrent terms of 20 years in prison for the aggravated assaults with a deadly weapon (Counts 5-9) and for aggravated battery (Count 10), and a suspended term of five years in prison each for possession of a firearm during the commission of a felony (Count 11) and for possession of a firearm by a convicted felon (Count 12). The verdict on Count 4 was found to merge with Count 2 for the purpose of sentencing, and the verdict on Count 3 stood vacated by operation of law.

Battle's trial counsel filed a motion for new trial on October 28, 2014, and the motion was amended through new counsel on October 2, 2015 and February 25, 2016. Battle's motion for new trial, as amended, was denied on March 4, 2016. He filed a notice of appeal on March 31, 2016, and his case was docketed to the April 2017 term of this Court. Battle's appeal was orally argued on April 18, 2017.

Carter's trial counsel filed a motion for new trial on October 6, 2014, and the motion was amended through new counsel on October 7, 2015. Carter's motion for new trial, as amended, was denied on March 4, 2016. He filed a notice of appeal on March 14, 2016, and his case was docketed to the April 2017 term of this Court. Carter's appeal was submitted for decision on the briefs.

the evening of September 7, 2012, Kevin Brittain, Kenneth Roberts, Walter Williams, Jearmain Finch, Travron Gill, and Kyle Pope were "hanging out" and smoking marijuana in the carport of Brittain's home on Erin Avenue in Fulton County. They were not selling marijuana and did not have firearms. After about an hour had passed, three to five African-American men with shirts over their faces and wielding pistols emerged from around a corner and yelled at the group, "freeze, don't nobody move," "don't nobody reach for a pistol," "put your hands up," and "y'all know what it is." The six friends raised their hands, but within seconds the gunmen started shooting. Brittain stayed in place with his head down. Pope ran around the outside of the house and hid in some bushes. Williams took off running but was shot "in the rear." Finch had his hands up and was first shot in the hand, and as he turned around and tried to run he was shot in the back and the left foot and fell to the ground; he was hospitalized for almost two months and sustained impairment to his ability to walk. Gill kept his head down, but after seeing Finch fall, he ran through the back yard and over a fence. Roberts, still with his hands raised, was shot in the right hand; the bullet went through his wrist and exited his forearm. As he turned to run, he was shot in the right thigh and then twice in the back. Roberts died as the result

3

of the four gunshot wounds.

Earlier that day, Adrieonna Jumper, who was then dating Carter, drove him around the area of the shooting in her rented white Hyundai Sonata. At one point, Carter exited the car, walked up the street, and spoke with a group of people in the "Big Four" store. One of the men, "Kyshawn," said that someone at the Chevron station had jewelry and money in his pocket, that he knew where the man was, and that he "got to move." Roberts wore a very visible large diamond watch with a diamond link. Kyshawn asked who wanted to go rob the person, and Harris asked, "what's the lineup," i.e., who was going along on the robbery. Battle discussed going and decided to join in the robbery. Carter returned to Jumper's car and asked Jumper if she could give him and the group a ride, and Jumper agreed. She recognized Harris and referred to him by his nickname, "Ding." She did not then know Battle by name, but she noticed that he had dreadlocks, and later identified him in a photographic lineup. Carter gave Jumper directions to Erin Avenue but did not say why they were going there, and Jumper drove them to Brittain's home.

Following the shooting, the gunmen returned to Jumper's car, and she drove Harris, who was wounded, to the hospital. Battle did not stay with them.

4

Later on, Jumper and Carter cleaned the back seat of the car with soap and water. After he was shot, Finch told his friends to take him to the fire station up the street from the house. They left Finch at the fire station and brought firemen back to the house to show them Roberts's body. Police and EMTs came to the scene of the shooting. Finch was taken to the hospital. Subsequently, Williams realized that he had been shot, and he was then taken to the hospital. Later on the night of September 7, Battle was at a neighborhood club and told Nathaniel Howard that he had gotten into a shootout, that one guy was running, and that he shot him in the back and thought that he had killed him. Earlier that day, Howard had seen Battle with a revolver. Battle also was worried that he had dropped his cell phone.

The detective that responded to the shooting went to the hospital and noticed that both Harris and Finch were brought in around the same time, but he did not immediately get to speak to either of them. The detective collected Harris's clothing and possessions as evidence. Among Harris's possessions was Battle's cell phone, which was later confirmed as the phone Battle was carrying and using the day of the shooting. Records of a call to Battle's phone ten minutes before the shooting revealed that the phone was then located in the

5

general geographic area of the crime scene.

The investigating detective received a tip that Carter was related to the investigation, and he had a description of a white four-door sedan. He tracked the car to Jumper and Carter, and was able to impound it. Harris's blood was found in the vehicle. Video surveillance at the hospital showed that Harris was removed from the rear passenger's side of this car, which had blood stains in the rear passenger seat. The detective interviewed Jumper, and she admitted that she was at the scene of the shooting with Carter. She told the detective that Harris had flagged them down while they were driving, that Carter spoke with Harris, that Carter asked her if they could get a ride, that Carter gave her directions to Erin Avenue, and that Carter instructed her as to how to position the vehicle.

The detective interviewed Carter, and Carter admitted that he was at the scene and that he had given Jumper directions to Erin Avenue but he maintained that he was sitting in the car next to Jumper during the shooting. In interviewing Howard, the detective determined that the motive behind the shooting was robbery and that Battle, Carter, and Harris were involved. Howard identified all three as being related to the shooting.

1.  Battle does not contest the legal sufficiency of the evidence of his guilt. Nevertheless, in accordance with this Court's general practice in appeals of murder cases, this Court has reviewed the record, and we conclude that the evidence at trial was sufficient to enable a rational trier of fact to find Battle guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Battle contends that the State violated its duty under *Brady v. Maryland* to disclose exculpatory evidence in failing to reveal that there was a purported "deal" between state and federal authorities regarding witness Howard's federal sentence at the time of trial, as Howard had received a two-year reduction in his federal sentence in exchange for his testimony against Battle.  However, Battle does not dispute that he did not raise this *Brady* claim at trial or in his motion for new trial, as amended; therefore, he has waived the right to raise this objection in the present appeal. *Pierce v. State*, 286 Ga. 194, 196 (2) (686 SE2d 656) (2009).

In any event, Battle provides only speculation that any reduction in

Howard's federal sentence[3] was directly related to his trial testimony inculpating Battle or that the State had any knowledge of such a deal.[4]  In fact, Howard's trial testimony belies such claim.  Howard acknowledged that he was then incarcerated on federal charges; that he had a gun charge and prior felonies, including three charges of possession of marijuana, a "gang charge," and an aggravated battery charge; and that he knew Battle, Harris, and Carter.  The prosecutor asked Howard why he testified against people he had known for years, and Howard said it was because law enforcement authorities had asked him about the shooting. The prosecutor asked Howard if he was hoping to get a deal or if he and the prosecutor had "any deal on this," and Howard responded, "No, ain't no deal." Then when asked what he was hoping would happen, Howard said that nothing was guaranteed, but that he was hoping that "they might" give him a reduction in his sentence.

3.  Battle next contends that the district attorney should have disqualified

---

[3] In support of his claim that Howard was given two years off his federal sentence, in his brief Battle references a document allegedly filed in October 2014 in Howard's federal criminal case, but any such document has not been made part of the record in this appeal.

[4] Battle makes the bare assertion that there was close cooperation between federal and state officials in this case, and therefore, urges this Court to "infer" that the State possessed evidence of the alleged deal.

himself and his office from prosecuting the case because the murder victim, Roberts, was the son of a longtime employee of the district attorney's office. Battle maintains that because of the employment the district attorney had a personal interest in the case that created the appearance of impropriety and a conflict of interest. But, the contention is unavailing. Battle did not raise this issue pre-trial or at trial, but first made the claim in his amended motion for new trial. However, pretermitting the timeliness of the contention, it fails on the merits.

Certainly, a conflict of interest or the appearance of impropriety from a close personal relationship with the victim may be grounds for disqualification of a prosecutor. See *Head v. State*, 253 Ga. App. 757, 758 (2) (560 SE2d 536) (2002). But, here there was no evidence that either the district attorney or the assistant district attorney directly prosecuting the case had any conflict of interest or a personal relationship with the victim or his mother or any personal interest in obtaining the sought convictions.[5]

---

[5] The evidence at the hearing on Battle's amended motion for new trial was that Roberts's mother worked as support staff on a trial team on the fourth floor of the district attorney's office. The lead prosecutor on the case testified that he did not have a personal relationship with the mother prior to the actual prosecution; they had "no real occasion to cross paths in the office"; his unit tried about 65 murders each year; the case was a major one and major cases normally did not go down to the trial division on the fourth floor but were handled by attorneys on the seventh floor; there were more

4. Finally, Battle contends that his trial counsel was ineffective for failing to object to the admission into evidence, via the testimony of the investigating detective, of statements by Carter allegedly in violation of *Bruton v. United States*, 391 U. S. 123 (88 SCt 1620, 20 LE2d 476) (1968).

In order for Battle to succeed on his claim of ineffective assistance, he must demonstrate both that his trial counsel's performance was deficient and that there is a reasonable probability that the result of his trial would have been different but for such deficiency. *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). If Battle fails to prove one prong of the *Strickland* test, then this Court need not examine the other prong. *Norwood v.*

than 100 lawyers in the office; after the murder, he considered the relationship with the mother to be like that of any parent of a victim on a homicide case that he handled; there was "nothing out of the ordinary" about his communications with the mother; he never spoke with the district attorney in general about any connection with the mother; and he was not directed to do anything differently in handling the case.

The district attorney testified that at the time he read the case file, he was unsure that he "even correlated" that a parent of the victim might have been an employee; he knew the mother only professionally as an employee in the office; he never interacted with her outside of the office; he knew that the employee's son had died, but when he reviewed a case file, he intentionally excluded certain information, so it might not have been apparent to him that the employee's son was the victim in the case; he did not recall any particular conversation with the prosecutors about the case; his personal interest in this case was the same as that in every case he had; he would have ensured that the mother had no part in the investigation of the case and he made sure that she had no part in its actual prosecution; he did not direct the lead prosecutor to do anything differently, and he would not have done so; he went to the victim's funeral as he had attended the funerals of victims in other homicide cases that he had prosecuted; and it was not unusual for prosecutors from the district attorney's office to attend the funeral of the victim in a case.

10

*State*, 297 Ga. 226, 227 (2) (773 SE2d 225) (2015). Furthermore, in this Court's review we accept the trial court's factual findings and credibility determinations unless they are clearly erroneous, but we independently apply the legal principles to the facts. Id.

Carter did not testify at the joint trial with Battle. The basis of the *Bruton* claim is testimony of the detective who interviewed Carter after speaking with Jumper. The detective related, in relevant part, that Carter "gave a very consistent, similar version of events" as that given by Jumper: that they were flagged down to give a ride to Erin Avenue; that Carter saw Harris, who he referred to by the nickname "Ding"; that Carter "passively admitted" that he gave directions to Jumper; that he described his interactions with "a guy with dreadlocks," but did not call Battle by name; that he talked to Harris and "the guy with dreadlocks" about purchasing marijuana; that after Jumper drove them to Erin Avenue, Harris and "the man with dreadlocks" got out of the car and that they returned with a third man; that Harris returned to Jumper's car with a gunshot wound and that they drove him to the hospital; and that "the man with dreadlocks" came back to the car initially but then did not go to the hospital with them.

11

A defendant's right under the Confrontation Clause is violated under *Bruton* when there is a joint trial of co-defendants and the testimonial statement of a co-defendant who does not testify at trial is used to implicate the other co-defendant in the crime or crimes on trial. *Ardis v. State*, 290 Ga. 58, 60 (2) (a) (718 SE2d 526) (2011). But, "*Bruton* excludes only the statement of a non-testifying co-defendant that standing alone directly inculpates the defendant." *Thomas v. State*, 300 Ga. 433, 439 (2) (a) (3) (796 SE2d 242) (2017), quoting *McLean v. State*, 291 Ga. 873, 875 (3) (738 SE2d 267) (2012). There is no *Bruton* violation when the statement on its face does not incriminate the defendant but becomes incriminating only when linked with other evidence introduced at trial. *Sutton v. State*, 295 Ga. 350, 353 (3) (759 SE2d 846) (2014). Battle urges that the statements at issue were directly incriminating enough so as to violate *Bruton*. However, even assuming arguendo a *Bruton* violation, that is not the end of the inquiry.

A *Bruton* violation may not be prejudicial when the complained-of statements are substantially similar to evidence properly admitted at trial. *Zackery v. State*, 286 Ga. 399, 402 (3) (688 SE2d 354) (2010). And, reversal of a defendant's convictions for such a violation in the context of a claim of

12

ineffectiveness of trial counsel is not warranted if given the strength of the evidence against the defendant, there is no reasonable probability that the outcome of the defendant's trial would have been more favorable had defense counsel made a *Bruton* objection which was sustained. *Burgess v. State*, 278 Ga. 314, 315 (1) (602 SE2d 566) (2004). Any *Bruton* error as the result of the related statements by Carter is not prejudicial in this case. Carter's statements are similar and contain far less detail than evidence from Jumper and Howard,[6] which included, inter alia, that Battle was seen with a firearm on the day of the crimes; that Battle left the Big Four store in Jumper's car to go to Erin Avenue to commit a robbery; that Battle exited Jumper's car during the time frame in question; that he returned to the vehicle along with the wounded Harris following the shooting; and that Battle later admitted his involvement in the fatal event, elaborating that he shot one of the victims in the back as the victim was attempting to escape and that he thought that he had killed the man. Furthermore, phone records placed the phone unquestionably used by Battle in the area of the crimes just minutes before the shooting.

---

[6] Contrary to Battle's assertion, neither Jumper nor Howard has been shown to be a "flawed witness" as that term was used in *Brown v. Superintendent Greene SCI*, 834 F3d 506, 520 (3d Cir. 2016).

Battle cannot show a reasonable probability that the result of his trial would have been different but for admission of the evidence of Carter's statements. *Strickland v. Washington*, supra. Thus, his claim that his trial counsel was ineffective for not objecting to such evidence must fail. *Burgess v. State*, supra at 315 (1).

<u>Case No. S17A1301</u>

5. Carter contends that the evidence was insufficient because there was no evidence introduced at trial that he planned or participated in the fatal shooting. In this Court's evaluation of the sufficiency of the evidence of a defendant's guilt, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt pursuant to *Jackson v. Virginia*. *Thomas v. State*, 300 Ga. 433, 436 (1) (796 SE2d 242) (2017). We do not reweigh the evidence or resolve conflicts in trial testimony; but rather, we view the evidence in a light most favorable to the verdict or verdicts, with deference to the jury's assessment of the weight and credibility of the evidence. Id.

It is certain that a participant in a crime may be convicted for the crime although he or she is not the one who directly committed the crime. OCGA §

14

16-2-21.[7]  A person is concerned in the commission of a crime and therefore is a party to it if the person:

> (1) Directly commits the crime; (2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity; (3) Intentionally aids or abets in the commission of the crime; or (4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime.

OCGA § 16-2-20 (b).  And, "while mere presence at the scene of a crime is not sufficient evidence to convict one of being a party to a crime, criminal intent may be inferred from presence, companionship, and conduct before, during and after the offense." (Citation and punctuation omitted.) *Sapp v. State*, 300 Ga. 768 (798 SE2d 226) (2017).

---

[7] OCGA § 16-2-21 provides:
> Any party to a crime who did not directly commit the crime may be indicted, tried, convicted, and punished for commission of the crime upon proof that the crime was committed and that he was a party thereto, although the person claimed to have directly committed the crime has not been prosecuted or convicted, has been convicted of a different crime or degree of crime, or is not amenable to justice or has been acquitted.

15

Here, the evidence showed that Carter intentionally aided or abetted the commission of the crimes by providing transportation for Battle and Harris; by directing the driver, Jumper, where to go to commit the crimes and then positioning her vehicle to flee the scene; staying with Jumper so that they could drive the defendants after the crimes were committed; and cleaning the car of evidence of the crimes. See, e.g., *Reynolds v. State,* 299 Ga. 781, 785 (1) (792 SE2d 393) (2016); *Joyner v. State*, 280 Ga. 37, 39 (1) (622 SE2d 319) (2005).

Simply, the evidence was sufficient to enable the jury to find Carter guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia*, supra.

Judgments affirmed.  All the Justices concur.

Decided August 14, 2017.

Murder. Fulton Superior Court. Before Judge Markle.

Patrick J. Hannon, for appellant (case no. S17A0714).

Juwayn Haddad, for appellant (case no. S17A1301).

Paul L. Howard, Jr., District Attorney, Arthur C. Walton, Paige Reese Whitaker, Lyndsey H. Rudder, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General, for appellee.