FINAL COPY
309 Ga. 599

S20A0855.  HARRIS v. THE STATE.

MCMILLIAN, Justice.

Robert Harris was convicted of malice murder and other offenses in connection with the fatal shooting of Kenneth Roberts and the assault of five other men.[1] Harris was jointly indicted and

---

[1] The crimes occurred on September 7, 2012. On March 22, 2013, a Fulton County grand jury indicted Harris jointly with Marcus Battle and Jacobey Carter on one count of malice murder, one count of felony murder while in the commission of an aggravated assault, six counts of aggravated assault with a deadly weapon, one count of aggravated battery, and one count of possession of a firearm during the commission of a felony. Additionally, Carter and Harris were jointly charged with felony murder while in the commission of possession of a firearm by a convicted felon, and each was individually charged with possession of a firearm by a convicted felon. Harris was tried with Carter and Battle in a jury trial that took place from September 22 to 29, 2014, and Harris was found guilty of all the charges against him.

The trial court sentenced Harris to serve life in prison without the possibility of parole for malice murder and concurrent terms of twenty years in prison for each of the five counts of aggravated assault not involving Roberts and for aggravated battery. Harris was given a suspended five-year sentence for possession of a firearm during the commission of a felony and the same sentence for possession of a firearm by a convicted felon. The conviction for aggravated assault of Roberts merged with the malice murder conviction for the purpose of sentencing, and the felony murder convictions were vacated by operation of law.

Harris's trial counsel filed a motion for new trial on October 10, 2014, and the motion was amended through new counsel on February 1 and April 29, 2016. Harris's motion for new trial, as amended, was denied on May 9, 2016.

tried with co-defendants Marcus Battle and Jacobey Carter. This Court affirmed Battle's and Carter's convictions in *Battle v. State*, 301 Ga. 694 (804 SE2d 46) (2017).

In this appeal, Harris asserts that his trial counsel rendered constitutionally ineffective assistance for failing to object to certain testimony from the investigating detective and that his motion-for-new trial counsel was constitutionally ineffective for failing to raise a *Brady*[2] claim and in not asserting a due process violation because Harris's conviction rests, in part, on false evidence. Harris also argues that the trial court abused its discretion in denying his motion for continuance and committed a merger error at sentencing. Although we conclude that the trial court erred in sentencing Harris for aggravated assault under Count 5, we otherwise affirm.

1. Our opinion in *Battle* sets out the facts underlying the crimes in this case as follows.

He filed a notice of appeal on May 13, 2016, but the record in the case was not submitted to this Court for docketing until January 3, 2020. The case was docketed to the April 2020 term of this Court and was submitted for a decision on the briefs.

[2] *Brady v. Maryland*, 373 U.S. 83, 87 (83 SCt 1194, 10 LE2d 215) (1963).

The evidence construed in favor of the verdicts showed the following. On the evening of September 7, 2012, Kevin Brittain, Kenneth Roberts, Walter Williams, Jearmain Finch, Travron Gill, and Kyle Pope were "hanging out" and smoking marijuana in the carport of Brittain's home on Erin Avenue in Fulton County. They were not selling marijuana and did not have firearms. After about an hour had passed, three to five African-American men with shirts over their faces and wielding pistols emerged from around a corner and yelled at the group, "freeze, don't nobody move," "don't nobody reach for a pistol," "put your hands up," and "y'all know what it is." The six friends raised their hands but within seconds the gunmen started shooting. Brittain stayed in place with his head down. Pope ran around the outside of the house and hid in some bushes. Williams took off running but was shot "in the rear." Finch had his hands up and was first shot in the hand, and as he turned around and tried to run he was shot in the back and the left foot and fell to the ground; he was hospitalized for almost two months and sustained impairment to his ability to walk. Gill kept his head down, but after seeing Finch fall, he ran through the back yard and over a fence. Roberts, still with his hands raised, was shot in the right hand; the bullet went through his wrist and exited his forearm. As he turned to run, he was shot in the right thigh and then twice in the back. Roberts died as the result of the four gunshot wounds.

Earlier that day, Adrieonna Jumper, who was then dating Carter, drove him around the area of the shooting in her rented white Hyundai Sonata. At one point, Carter exited the car, walked up the street, and spoke with a group of people in the "Big Four" store. One of the men, "Kyshawn," said that someone at the Chevron station had jewelry and money in his pocket, that he knew where the

man was, and that he "got to move." Roberts wore a very visible large diamond watch with a diamond link. Kyshawn asked who wanted to go rob the person, and Harris asked, "what's the lineup," i.e., who was going along on the robbery. Battle discussed going and decided to join in the robbery. Carter returned to Jumper's car and asked Jumper if she could give him and the group a ride, and Jumper agreed. She recognized Harris and referred to him by his nickname, "Ding." She did not then know Battle by name, but she noticed that he had dreadlocks, and later identified him in a photographic lineup. Carter gave Jumper directions to Erin Avenue but did not say why they were going there, and Jumper drove them to Brittain's home.

Following the shooting, the gunmen returned to Jumper's car, and she drove Harris, who was wounded, to the hospital. Battle did not stay with them. Later on, Jumper and Carter cleaned the back seat of the car with soap and water. After he was shot, Finch told his friends to take him to the fire station up the street from the house. They left Finch at the fire station and brought firemen back to the house to show them Roberts's body. Police and EMTs came to the scene of the shooting. Finch was taken to the hospital. Subsequently, Williams realized that he had been shot, and he was then taken to the hospital. Later on the night of September 7, Battle was at a neighborhood club and told Nathaniel Howard that he had gotten into a shootout, that one guy was running, and that he shot him in the back and thought that he had killed him. Earlier that day, Howard had seen Battle with a revolver. Battle also was worried that he had dropped his cell phone.

The detective that responded to the shooting went to the hospital and noticed that both Harris and Finch were brought in around the same time, but he did not

immediately get to speak to either of them. The detective collected Harris's clothing and possessions as evidence. Among Harris's possessions was Battle's cell phone, which was later confirmed as the phone Battle was carrying and using the day of the shooting. Records of a call to Battle's phone ten minutes before the shooting revealed that the phone was then located in the general geographic area of the crime scene.

The investigating detective received a tip that Carter was related to the investigation, and he had a description of a white four-door sedan. He tracked the car to Jumper and Carter, and was able to impound it. Harris's blood was found in the vehicle. Video surveillance at the hospital showed that Harris was removed from the rear passenger's side of this car, which had blood stains in the rear passenger seat. The detective interviewed Jumper, and she admitted that she was at the scene of the shooting with Carter. She told the detective that Harris had flagged them down while they were driving, that Carter spoke with Harris, that Carter asked her if they could get a ride, that Carter gave her directions to Erin Avenue, and that Carter instructed her as to how to position the vehicle.

. . .

In interviewing Howard, the detective determined that the motive behind the shooting was robbery and that Battle, Carter, and Harris were involved. Howard identified all three as being related to the shooting.

*Battle,* 301 Ga. at 695-97.

With regard to Harris, the evidence at trial also showed that

Harris told investigators that on the day of the incident, he

happened to be walking, alone, from his aunt's house in the area of the crime scene with the intent of purchasing marijuana when he ran into three men with whom he exchanged words. Moments later he heard gunfire and realized that he had sustained a gunshot wound to his leg. He said he continued up the street, leaned on someone's car to rest, and called his girlfriend to drive him to the hospital. Harris denied ever being in the driveway of the house where the shootings occurred. However, police verified that at least one of the three men Harris eventually identified had been in jail at the time of the crimes.[3] Additionally, an eyewitness testified that after the shootings, he saw a man limping back to a white car with a gun in his hand. The surveillance footage from the hospital showed Harris being removed from Jumper's white car, and Harris's girlfriend denied driving him to the hospital. Traces of blood in

---

[3] Harris originally told police that he ran into a group of four men that day, but Harris later realized that one of the four men he had named was actually incarcerated at the time, and he changed his statement, saying he had talked to a group of only three men. Therefore, two of the four men Harris originally identified were incarcerated at the time of the alleged conversation.

Jumper's car were identified as belonging to Harris, and a blood trail leading from the driveway at the crime scene also was identified as Harris's blood.[4]

Although Harris does not challenge the sufficiency of the evidence, we have independently reviewed the record consistent with our current practice in murder cases and conclude that the evidence presented at trial was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Harris was guilty of the crimes for which he was convicted.[5] See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Harris contends that he received constitutionally ineffective assistance from both his trial counsel and the counsel who

---

[4] At the close of the State's evidence, the prosecutor introduced a copy of a prior felony conviction for Harris to support the charge of possession of a firearm by a convicted felon and the charge of felony murder predicated on that offense.

[5] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, ___ Ga. ___, ___ (4) (__ SE2d ___) (2020). The Court began assigning cases to the December term on August 3, 2020.

represented him in connection with his motion for new trial.

In order to establish his claims of ineffective assistance of counsel, Harris must demonstrate that his counsel were professionally deficient and that there is a reasonable probability that the outcome of his trial would have been different if counsel had not performed deficiently. See *Strickland v. Washington*, 466 U.S. 668, 687, 694 (III) (A), (B) (104 SCt 2052, 80 LE2d 674) (1984).

> An attorney performs deficiently under *Strickland* if he discharges his responsibilities at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms. Prejudice is shown by demonstrating a reasonable probability sufficient to undermine confidence in the outcome that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different.

*Newton v. State*, __ Ga. __, __ (3) (843 SE2d 857) (2020) (citations and punctuation omitted). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-34 (2) (690 SE2d 801) (2010).

(a) Harris asserts that his trial counsel rendered

constitutionally ineffective assistance by failing to object when the investigating detective improperly opined that Harris had shot himself in the leg while fleeing the crime scene on the theory that the detective lacked the expertise, training, and experience necessary to draw such a conclusion.

The detective testified at trial that he had been with the Atlanta Police Department for over twelve years, the first six as a patrol officer with the primary duty of responding to 911 calls and the remainder as a detective, in which capacity he investigated aggravated assaults, stabbings, shootings, and homicides. On cross-examination, the detective testified that it was his theory that Harris, or someone who was with Harris, shot Harris in the right leg, but the detective's primary theory was that Harris shot himself. The detective was then asked whether he was aware that Harris was left-handed, and the detective said he was not aware that Harris had that trait. The detective later testified on re-direct, however, that his theory would not change even if Harris were left-handed, explaining that he based the theory on evidence that

Harris's blood trail began where police found cartridge cases laying on the driveway, even though Harris said he was never on the driveway. Harris also described his gunshot wound as elongated from top to bottom, which the detective said was not consistent with what he typically observed when someone was shot straight on. In such cases, the detective said the wound is "typically more circular," but an elongated wound is more consistent with a shot from top to bottom.

Under OCGA § 24-7-701 (a) ("Rule 701 (a)"), a lay witness may testify "in the form of opinions or inferences that are rationally based on the witness's perception, helpful to a clear understanding of the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge." *Bullard v. State*, 307 Ga. 482, 491 (4) (837 SE2d 348) (2019) (citation and punctuation omitted). Here, the detective's opinion that Harris shot himself in the leg was rationally based on inferences he formed from his review of the evidence and his prior observations of gunshot wounds, which did not require scientific, technical, or other specialized knowledge.

Moreover, the detective's testimony was helpful in determining how Harris was injured on the night of the crime. Accordingly, this testimony was admissible under Rule 701 (a). See *Bullard*, 307 Ga. at 492 (4) ("[L]ay witnesses may draw on their professional experiences to guide their opinions without necessarily being treated as expert witnesses." (citation and punctuation omitted)); *Thornton v. State*, 307 Ga. 121, 128 (3) (c) (834 SE2d 814) (2019) (detective's opinion that appellant was the only person who had been in a position to shoot victim was properly admitted under Rule 701 (a)). And because Harris has not shown that his trial court performed deficiently in not objecting to this testimony, this ineffective assistance of counsel claim fails. See *Hampton v. State*, 295 Ga. 665, 670 (2) (763 SE2d 467) (2014) ("[T]he failure to make a meritless . . . objection does not provide a basis upon which to find ineffective assistance of counsel.").

(b) Harris next asserts that his motion-for-new-trial counsel was constitutionally ineffective in failing to assert a *Brady* claim on the ground that the prosecution failed to inform the defense that one

of the State's witnesses had made a deal to testify at Harris's trial in exchange for a reduced sentence on an unrelated federal charge. But before turning to the merits of the claim, we note that Harris has moved this Court to remand the case to allow him to put testimony and evidence in the record to support this claim.[6]

> Generally, when a preserved ineffective assistance of counsel claim is raised for the first time on appeal, we must remand for an evidentiary hearing on the issue. But remand is not mandated if we can determine from the record that the defendant cannot establish ineffective assistance of counsel under the two-prong test set forth in *Strickland*.

*Styles v. State*, 308 Ga. 624, 628-29 (3) (842 SE2d 869) (2020) (citation, punctuation and footnote omitted). See also *Anthony v. State*, 302 Ga. 546, 554 (V) (807 SE2d 891) (2017). As explained below, an evidentiary hearing is not necessary in this case because

---

[6] Although Harris did not raise this issue before the trial court, he notes that his appellate counsel did not begin to represent him until after the denial of the motion for new trial and the filing of the notice of appeal, and he argues therefore this appeal marks the first occasion that he could raise a claim of ineffective assistance of motion counsel. See *Anthony v. State*, 302 Ga. 546, 554 (V) (807 SE2d 891) (2017) (appellant preserved issue of ineffective assistance of post-trial counsel where his current appellate counsel did not represent him prior to appeal and thus appeal was "the earliest practicable opportunity of post-conviction review." (citation and punctuation omitted)).

we can determine from the record that Harris cannot establish that motion counsel rendered ineffective assistance of counsel by failing to raise a *Brady* claim.

In order to establish a *Brady* violation as a basis for his ineffective assistance of motion counsel claim, Harris must show that

> (1) the State, including any part of the prosecution team, possessed evidence favorable to the defendant; (2) the defendant did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) a reasonable probability exists that the outcome of the trial would have been different had the evidence been disclosed to the defense.

*Mitchell v. State*, 307 Ga. 855, 861-62 (2) (b) (838 SE2d 847) (2020) (citation and punctuation omitted).

The record shows that Nathaniel Howard was the only witness at trial to supply robbery as the motive for Harris and his co-defendants. Howard appeared at trial in a jumpsuit and chains, and when the prosecutor asked for an explanation for this attire, Howard testified that he was in custody in Virginia after his conviction on a

federal gun charge. The prosecutor then asked whether the State had a deal with Howard for his testimony, and Howard replied, "No, ain't no deal." Howard testified, however, that he was hoping to get a reduction in his federal sentence in exchange for his testimony, but as far as he knew, "there's nothing guaranteed." Later on in cross-examination, Howard said that any reduction in his sentence on the federal charge was up to the judge in that case, although he did not know how the federal judge would learn what had transpired at Harris's trial.

On appeal, Harris argues that the State withheld evidence that at the time of trial, Howard had already received a 24-month sentence reduction in his federal criminal case in exchange for his cooperation in the prosecution of Harris and his co-defendants.[7]

---

[7] Harris acknowledges that no evidence of this deal appears in the appellate record but asserts that if the Court grants a remand, he can produce such evidence, including the transcript of Howard's sentencing hearing, which occurred five months prior to Harris's trial but was not filed until after the trial. We note that neither Battle nor Carter asserted ineffective assistance of counsel on this ground in the prior appeal. Battle argued on appeal that the State had violated its duty under *Brady* by failing to provide the defense with evidence of Howard's deal, but we held that Battle waived the issue by failing to raise it below and noted that, in the absence of any evidence of the deal,

Harris contends that evidence of this completed deal would have been an important factor in the jury's evaluation of Howard's credibility, particularly his testimony that Harris and the co-defendants intentionally went to the scene to commit a robbery.

Even if Harris could establish the first three elements of his *Brady* claim on remand, he will not be able to establish a reasonable probability that the outcome of his trial would have been different if the State had disclosed information about Howard's alleged deal with the federal prosecutors. Harris's defense was that he was in the area to purchase marijuana, so the jury had an alternative basis for placing Harris at the scene. Additionally, the evidence at trial showed that Howard began speaking with law enforcement about the crimes in this case in September 2013, approximately one year before Harris's trial, and thus months before the date Harris contends Howard was sentenced in federal court. His testimony at trial was consistent with his pretrial statements to police. Also,

Battle had provided "only speculation" that Howard received any reduction in sentence. *Battle*, 301 Ga. at 697-98 (2).

Howard admitted at trial that he was testifying with the hope of receiving a reduced sentence on his federal charge and that it was up to the federal judge to determine if that happened. Under these circumstances, we cannot conclude that a reasonable probability exists that the outcome of the trial would have been different if the jury had known that Howard's deal was completed rather than merely pending when he testified. Therefore, pretermitting whether a remand of the case would allow Harris to prove the other elements of a *Brady* claim, his claim fails because he cannot successfully establish the prejudice element of the claim. See *Milner v. State*, 281 Ga. 612, 613-14 (3) (641 SE2d 517) (2007). And because Harris cannot establish the prejudice element of his *Brady* claim, he also cannot prove prejudice for his ineffective assistance of motion counsel claim. See *Strickland*, 466 U.S. at 694 (III) (B) ("the appropriate test for prejudice [in an ineffective assistance of counsel claim] finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution" under *Brady*).

(c) Harris also contends that his motion-for-new-trial counsel performed deficiently in failing to assert a due process claim because Harris's conviction rests, in part, on Howard's false testimony that he had no deal and in failing to present evidence in support of that claim.

"The knowing use of material, false evidence by the State in a criminal prosecution violates due process[,]" even where "the falsehood bears upon the witness'[s] credibility rather than directly upon the defendant's guilt." *DeLoach v. State*, 308 Ga. 283, 292 (3) (840 SE2d 396) (2020) (citation and punctuation omitted). See also *Giglio v. United States*, 405 U.S. 150, 153 (92 SCt 763, 31 LE2d 104) (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (79 SCt 1173, 3 LE2d 1217) (1959). To prevail on this claim, Harris must show that

> (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment.

*United States v. Stein*, 846 F3d 1135, 1147 (II) (a) (2) (11th Cir. 2017) (citation and punctuation omitted). See also *DeLoach*, 308 Ga. at 292

(3).

Here, Howard never expressly denied that he had a deal with federal prosecutors, only that he had a deal with the State. He also testified that the reduction in his federal sentence was not guaranteed but was up to the federal judge. Even if Harris could establish on remand that this testimony was false and that the prosecutors for the State knew it to be false at the time of trial, we conclude that Harris cannot establish a reasonable likelihood that the testimony affected the jury's verdict because, as discussed above, the jury knew Howard's motivation for testifying. Likewise, Harris cannot establish a reasonable probability that the trial court would have granted the motion for new trial had motion counsel raised a due process claim below, and thus he cannot prevail on his claim of ineffective assistance of counsel on this ground.

3. Harris next asserts that the trial court abused its discretion when it denied his trial counsel's motion for continuance. Under OCGA § 17-8-22, "[a]ll applications for continuances are addressed to the sound legal discretion of the court and, if not expressly

provided for, shall be granted or refused as the ends of justice may require." This Court will not disturb a refusal to grant a continuance "unless it clearly appears that the judge abused his discretion in this regard." *Keller v. State*, 308 Ga. 492, 500 (3) (842 SE2d 22) (2020) (citation and punctuation omitted). "Furthermore, to be entitled to a new trial based upon the denial of a motion for a continuance, a defendant has the burden to show that he was harmed by that denial." *Geiger v. State*, 295 Ga. 648, 651 (3) (763 SE2d 453) (2014) (citation and punctuation omitted).

The record reflects that the public defender originally assigned to Harris's case moved to withdraw from her representation of Harris on June 10, 2014, citing a conflict with Harris. Specifically, when Harris's assigned public defender was six-months pregnant, Harris threatened her family and sent people to her office to confront her. Also, in phone calls recorded from jail, Harris said the State was trying to rush him to trial and that he had his attorney "in a blender" and had sent people to his attorney's office "to push up on her." At the withdrawal hearing, the prosecution urged the court not to allow

Harris to take similar delaying tactics with new counsel. The trial court granted the motion to withdraw, appointed replacement counsel for Harris, and specially set trial for Harris and his co-defendants for September 22, 2014.

On August 28, 2014, the trial court appointed another attorney to represent Harris, but the record contains no clear explanation for this change in counsel. Harris's new attorney filed a written motion for a continuance on the same day he entered an appearance in the case, asserting that the "complexity of the case, [the] serious nature of the charges[,] and the lack of time to adequately prepare, prevent[ed him] from providing a competent defense." The next day, the trial court entered a written order denying the motion, without explanation.

At the pretrial hearing on September 19, 2014, Harris's trial counsel made an oral motion for reconsideration of his continuance request, asserting that he was still "unprepared," as he had been provided only 20 days to get ready for trial. The trial court denied the motion, noting that the trial date had been specially set and

Harris had already been incarcerated for 596 days. The trial court stated that, based on its observations of Harris's counsel from a prior multi-defendant murder trial, it believed that counsel could handle the trial, and it offered to give trial counsel extra time to consult with Harris or to interview witnesses during trial.

Pretermitting whether the trial court abused its discretion in denying Harris's motion for continuance, Harris is not entitled to a new trial on this ground if he cannot show harm. See *Geiger*, 295 Ga. at 651 (3). Harris contends that the harm to his defense from the denial of his continuance motion is apparent in his trial counsel's failure to discover or present evidence that Howard received a sentence reduction in exchange for his testimony; to consult an expert "[who] could confirm or refute" the detective's testimony that Harris' gunshot wound was self-inflicted; or to present any evidence that Harris was left-handed. However, as discussed above, Harris cannot establish prejudice resulting from the jury's failure to hear evidence that Howard had already received a sentence reduction on the federal charge when the jury heard evidence that Howard was

motivated by the prospect of such an outcome and was presented with evidence that provided an alternative basis for placing Harris at the crime scene. Harris also failed to show how his trial counsel's failure to consult an unidentified expert who might either confirm or refute the detective's testimony harmed his defense. See *Phoenix v. State*, 304 Ga. 785, 789 (2) (822 SE2d 195) (2018) (appellant failed to show that he was harmed by the continuance denial, which prevented his counsel from hiring an expert, where appellant "made no showing as to who the expert would be, what his or her testimony would be expected to show, or how that testimony would benefit him" (citation and punctuation omitted)). And Harris has not shown how the lack of additional preparation time prevented trial counsel from presenting evidence that Harris was left-handed. Accordingly, because Harris has failed to show any harm resulting from the denial of a continuance, this claim fails. See *Virger v. State*, 305 Ga. 281, 304 (10) (824 SE2d 346) (2019) (appellant failed to establish harm resulting from trial court's denial of motion for continuance where defendant failed to show what additional evidence the defense

would have presented if court had granted a continuance); *Davis v. State*, 240 Ga. 763, 765 (1) (243 SE2d 12) (1978) (appellant failed to show harm from denial of continuance where he made no showing "as to how additional time would have benefited defendant or how the lack of time harmed him").

4. Harris argues that the trial court erred in sentencing him separately under Count 5 for aggravated assault by shooting Jearmain Finch and under Count 10 for aggravated battery by shooting Finch and rendering his legs useless. We agree.

Although Finch was shot multiple times in quick succession in the hand, foot, and back, both the aggravated assault and the aggravated battery were based on the same conduct of shooting the same victim. See *Wofford v. State*, 305 Ga. 694, 696 (1) (b) (827 SE2d 652) (2019) (aggravated assault merged into aggravated battery based on same conduct in shooting victim); *Douglas v. State*, 303 Ga. 178, 183 (4) (811 SE2d 337) (2018) (three separate injuries sustained by one victim during a single, uninterrupted criminal act involving multiple gunshots did not support three separate criminal charges);

*Regent v. State*, 299 Ga. 172, 176 (787 SE2d 217) (2016) (where defendant slashed victim twice in quick succession, aggravated assault charge based on slashing victim's throat merged into aggravated battery based on same conduct). Because the aggravated assault should have merged with the aggravated battery, we vacate Harris's conviction and sentence for aggravated assault under Count 5.

*Judgment affirmed in part and vacated in part. All the Justices concur.*

DECIDED AUGUST 24, 2020.

Murder. Fulton Superior Court. Before Judge Markle.

*Christina R. Cribbs*, for appellant.

*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Juliana Sleeper, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mark S. Lindemann, Assistant Attorney General*, for appellee.