313 Ga. 443
FINAL COPY

S22A0170. WILLIAMS v. THE STATE.

MCMILLIAN, Justice.

Allen Williams appeals his conviction for felony murder in connection with the death of his girlfriend, Betty Ranow.[1] Williams argues on appeal that the trial court erred in admitting evidence concerning his alleged beating of another person and in failing to conduct an evidentiary hearing to determine whether his

---

[1] Ranow died on the night of December 18 to 19, 2010, and on March 3, 2011, a Gwinnett County grand jury indicted Williams in connection with her death, charging him with malice murder, felony murder based on aggravated battery, felony murder based on aggravated assault, aggravated battery, aggravated assault, and concealing the death of another. Williams was tried before a jury from March 3 to 14, 2014, and convicted of both counts of felony murder, aggravated battery, and aggravated assault. The jury acquitted Williams of malice murder, and the trial court granted the State's oral motion at trial to dismiss the charge of concealing the death of another. Williams was sentenced to life in prison for the count of felony murder based on aggravated battery, and the remaining counts were merged or vacated.

Williams filed a timely motion for new trial on March 20, 2014, and amended that motion through new counsel on July 20, 2016. Following a hearing, the trial court denied the motion for new trial as amended on May 25, 2021. Williams timely appealed that ruling to the Court of Appeals, which transferred the matter to this Court. The case was docketed to the term of this Court beginning in December 2021 and submitted for a decision on the briefs.

statements to the police in connection with that incident were freely and voluntarily given before they were introduced at trial. Because we conclude that any error in the admission of this evidence was harmless, we affirm.

The evidence presented at trial showed that in 2010, Williams and Ranow lived together in a house in Lawrenceville. At around 8:15 p.m. on December 18, Ranow approached a woman who was sitting in her car outside a doughnut shop near the house where Ranow and Williams lived. The woman, who did not know Ranow, described her as appearing "frazzled," intoxicated, and inappropriately dressed for the cold December weather, as she was wearing only jeans, a t-shirt, and slippers. Ranow asked the woman for a ride to downtown Lawrenceville, and the woman, who had just come from church and who said she felt sorry for Ranow, agreed to Ranow's request. They prayed together on the drive, and when they reached their destination, the woman removed her own yellow coat and gave it to Ranow to wear. The coat was clean with no stains on it at that time.

At around 8:53 that night, Officer Brad Daugherty of the Lawrenceville Police Department ("LPD") responded to a call for a welfare check on Ranow outside a restaurant in downtown Lawrenceville. Ranow, with whom Officer Daugherty was familiar, asked him to drive her home. Ranow was wearing a clean "mustard yellow" coat with no stains, and Officer Daugherty could smell alcohol on her person. Officer Daugherty drove Ranow to the house she shared with Williams. He dropped her off in front of the house but did not see her go inside.

The next morning, at around 5:48, Williams called 911 from their house to ask for an ambulance. Brent Moss, an LPD patrol officer, was the first to arrive at the scene. Williams led Officer Moss inside the house where Ranow's body was lying on the floor. Williams placed his hand on Ranow's chest and told Officer Moss that Ranow was "barely breathing." However, Officer Moss could see that Ranow was not breathing at all, and he directed Williams outside. Officer Moss smelled alcohol coming from Williams and testified that Williams appeared intoxicated. Williams told Officer

3

Moss that when Ranow arrived home,[2] she had already been beaten. According to Williams, Ranow told him she had been drugged and assaulted and that the people who did that put her clothes in the trash can outside. Williams also told police that Ranow came home wearing a yellow coat that Williams had never seen before and that the coat was outside in a trash can. He told one officer exactly where to find that trash can. Williams further asserted that whoever gave Ranow the yellow coat also gave her the drugs and beat her up.

Emergency medical personnel arrived at the house approximately three minutes after Officer Moss. One of the paramedics who responded to the scene testified that Ranow was deceased when he arrived. Her body was cold to the touch and showed signs of lividity where the blood had settled. There was a pool of dried blood around Ranow's head and dried blood around her eyes.

Officer Moss kept Williams from going back inside the house,

---

[2] Officer Meadows said that he dropped Ranow at home sometime after 8:53 p.m. on December 18, but Williams never said what time he saw Ranow come into the house.

and Williams became irate, leading the officer to call for backup. An LPD watch commander, who arrived at the crime scene in response to Officer Moss's call, observed that Williams had blood on his head and that his right hand was "scuffed up." The watch commander said that Williams appeared very nervous and fidgety and was trying to leave the scene, saying he had "other places to go." The watch commander ordered that Williams be secured in the back of a patrol car and that a security sweep of the house be conducted. No one else was located inside.

Police observed blood inside the house around Ranow's body, blood smears on the front doorframe, and blood inside the front screened-in porch; only a few drops of blood were discovered outside the enclosed porch on the walkway leading to the porch door. There was no blood trail leading from the street and no blood in the yard, on the driveway, or on the street itself. The officers also recovered a yellow jacket with what appeared to be bloodstains from an open trash container outside the house. At trial, the woman who gave Ranow a ride to downtown Lawrenceville identified it as the jacket

she had given Ranow, and Officer Daugherty confirmed that the jacket appeared to be the one Ranow was wearing when he dropped her off at the house. Later, after Williams was transported to the police station, officers observed that Williams's right hand was swollen, with discoloration to the back of his hand, scuff marks, and abrasions. He was taken to the hospital for treatment.

The medical examiner who conducted the autopsy found severe bruising, abrasions, and swelling on Ranow's body and tread marks on her face consistent with footwear. She also observed that Ranow had a "raccoon-eye appearance," caused by the entrapment of blood in the soft tissues of the eyes, which, the medical examiner explained, is indicative of head trauma. The medical examiner discovered injuries to other parts of Ranow's body as well and observed that Ranow had internal injuries corresponding to her external injuries, including eight broken ribs. She testified that all the injuries were indicative of blunt force trauma, and the injuries to Ranow's head resulted in brain damage and diffuse bleeding within the scalp, factors that can lead to immediate loss of

6

consciousness, concussion, and death. Based on the post-mortem examination, the medical examiner concluded that Ranow's manner of death was homicide caused by blunt force trauma to her head, neck, and chest. The medical examiner also observed that Ranow's body was dressed in clean clothes, indicating that they were not on her body at the time her injuries occurred and that the placement of the clothing on the body suggested that someone else had dressed her because one of Ranow's arms was not fully in the sleeve of her sweater and her pants were not pulled over her hips. DNA recovered from Ranow's body was tested and determined to match Williams's DNA.

At trial, the State presented evidence of Williams's involvement in two previous physical altercations: a June 2010 incident involving Ranow and an August 2010 incident involving Ronald Strode, who lived in the Lawrenceville house with Ranow and Williams at the time.[3] With regard to the June 2010 incident, a

---

[3] The State filed a timely notice of intent to introduce this other-acts evidence prior to trial, and Williams opposed its admission at an evidentiary

retired LPD police officer testified that while he was still employed with the LPD, he came upon an altercation between Williams and Ranow at a gas station within walking distance of their house. During the altercation, the officer saw Williams hit Ranow in the chest a few times, almost causing her to fall down. The officer placed both Williams and Ranow under arrest for public drunkenness.

The State presented two witnesses to testify about the incident involving Strode, which occurred on the night of August 12 to 13, 2010. Strode testified that sometime during the night, Williams came into Strode's bedroom, asked Strode if he had seen Ranow, and used his fists to beat Strode in the face, head, and chest. Strode was able to break away from Williams and walk to the nearby house of a friend, who called an ambulance. Strode was taken to the hospital for treatment, which included brain surgery. The State also

hearing on the matter. The trial court subsequently issued a written order ruling that the evidence of both incidents was admissible. On appeal, Williams contests only the introduction of the evidence regarding the Strode incident, which was admitted to show identity; he does not contest the admissibility of the June 2010 incident involving Ranow, which the trial court admitted as showing prior difficulties between the parties.

presented testimony from a uniform patrol sergeant from the Gwinnett County Police Department who investigated the Strode incident. He testified that he interviewed Williams after Strode identified Williams as his assailant. The sergeant testified that during the custodial interview, Williams said he returned home on the night of August 12 to 13, and, while still outside, saw Ranow and Strode through the window. Williams told the sergeant that Strode and Ranow were on the bed together, with Strode's hand between Ranow's legs. Williams said he went inside and confronted Strode about the condition of the house, which was in disarray, and Ranow told Williams that Strode had attempted to rape her. Williams admitted to the sergeant that, at some point during the night, he struck Strode once with an open hand, because Williams believed that he had interrupted an attempted rape. Williams explained that he was upset because Ranow did not appear to be resisting Strode and that she had been unfaithful to Williams many times in the past.

1. Williams asserts that the trial court erred in admitting

9

evidence of the Strode incident pursuant to OCGA § 24-4-404 (b)

("Rule 404 (b)")[4] for the purpose of showing identity.

In order to introduce extrinsic evidence under Rule 404 (b), the State must show:

> (1) that the evidence is relevant to an issue in the case other than the defendant's character; (2) that the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) that there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

*Strong v. State*, 309 Ga. 295, 300 (2) (a) (845 SE2d 653) (2020). And "[w]hen evidence is offered pursuant to Rule 404 (b) to prove identity, it must satisfy a particularly stringent analysis." *Moon v. State*, 312 Ga. 31, 53 (3) (c) (iii) (860 SE2d 519) (2021) (citation and punctuation omitted).

> The extrinsic act must be a "signature" crime, and the defendant must have used a modus operandi that is uniquely his. . . . Evidence cannot be used to prove

---

[4] OCGA § 24-4-404 (b) provides:

> Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

identity simply because the defendant has at other times committed the same commonplace variety of criminal act.

*Brooks v. State*, 298 Ga. 722, 725 (2) (783 SE2d 895) (2016) (citations and punctuation omitted).

At an evidentiary hearing, the State proffered the Rule 404 (b) evidence relating to the Strode incident for the sole purpose of showing identity, and Williams's counsel argued that the evidence was inadmissible for that purpose under Rule 404 (b) because there was no distinct criminal signature common to that incident and the charged crime; the two incidents were dissimilar in that Williams was trying to protect Ranow in the Strode incident, which has nothing to do with the crimes resulting in Ranow's death; and in any event, the evidence was more prejudicial than probative. However, the trial court determined that the Strode incident was sufficiently similar to the crime in this case to be relevant to the issue of identity.[5] The trial court also found that there was sufficient proof

___

[5] In reaching this decision, the trial court noted that the two crimes both occurred at the same house, involved people with whom Williams was living, involved the use of Williams's hands to beat the victim in the same areas of the body, and occurred only four months apart.

11

to enable a jury to find by a preponderance of the evidence that Williams committed the Strode battery and the probative value of the evidence was "not substantially outweighed by undue influence."

Pretermitting whether the trial court abused its discretion in admitting the Strode-related evidence on the issue of identity, we conclude that any error in its admission was harmless in light of the other compelling evidence of Williams's guilt. "Evidentiary errors require reversal only if they harm a defendant's substantial rights." *Troy v. State*, 312 Ga. 860, 862 (866 SE2d 394) (2021). See also OCGA § 24-1-103 (a). And, a "nonconstitutional error," as alleged here, "is harmless if it is highly probable that the error did not contribute to the verdict." *Davenport v. State*, 309 Ga. 385, 389 (2) (846 SE2d 83) (2020) (citation and punctuation omitted). See also *Boothe v. State*, 293 Ga. 285, 289-90 (2) (b) (745 SE2d 594) (2013). In order to determine whether the disputed evidence contributed to the verdict, we "review the evidence de novo, after setting aside any evidence that was admitted as a result of the error," and we "'weigh the (remaining) evidence as we would expect reasonable jurors to

12

have done so as opposed to viewing it all in the light most favorable to the jury's verdict.'" *Troy*, 312 Ga. at 862 (citing *Peoples v. State*, 295 Ga. 44, 55 (4) (c) (757 SE2d 646) (2014)).

Even apart from the Strode-related evidence, the remaining evidence that Williams beat Ranow to death was strong. Officer Daugherty was the last person to see Ranow alive when he dropped her off at the house she shared with Williams sometime after 8:53 p.m. on December 18, 2010, and there was no evidence that anyone other than Williams and Ranow were at the house that night. Williams called 911 early the next morning and told responding officers that Ranow had been beaten sometime before she arrived at the house and that the person who gave Ranow the yellow coat had provided the drugs and beat her. However, Officer Daugherty saw Ranow in the yellow coat, and she had not been beaten. Also, most of the blood evidence was confined to the interior of the house. The evidence indicated that someone had dressed Ranow's body in clean clothing after she was beaten, while the yellow coat Ranow was wearing when she was last seen alive was found covered in

13

bloodstains in a trash can right outside the house, and Williams knew exactly where it was. Although Williams claimed that Ranow was alive when he called for help, testimony from police and medical responders indicated that she had been dead for some time when they arrived. In addition, one officer at the scene observed that Williams had injuries to his hand, which later required medical treatment, as well as blood on his head.

Moreover, there was evidence of prior difficulties between Williams and Ranow from a prior incident a few months before when Williams had been observed, in public, hitting Ranow in the chest, and almost knocking her down, which demonstrated the nature of Williams's relationship with Ranow and supported his motive to harm her. See *Flowers v. State*, 307 Ga. 618, 621 (2) (837 SE2d 824) (2020). Thus, to the extent that the State relied on the Strode-related evidence to prove identity, that evidence was largely cumulative of the much more probative evidence showing that Williams killed Ranow. See *Virger v. State*, 305 Ga. 281, 296 (8) (b) (824 SE2d 346) (2019) (where Rule 404 (b) evidence was cumulative

14

of other properly admitted evidence, any error in its admission was harmless); *Douglas v. State*, 303 Ga. 178, 183 (3) (811 SE2d 337) (2018) (same).

Further, the trial court, using a charge approved by the parties, instructed the jury that the Strode-related evidence could not alone support a finding that Williams committed the acts alleged, and that the jurors could not "convict a person simply because [they] believe he may have committed the alleged similar acts in the past." The trial court gave a version of this instruction four times: in its pretrial charge to the jury, before the introduction of the evidence of the June 2010 incident with Ranow, before the evidence of the Strode incident, and in the final jury charge. Because "[w]e ordinarily presume that jurors follow such instructions," any unfair prejudice from the admission of the Strode-related evidence was reduced. See *Bentley v. State*, 307 Ga. 1, 8 (2) (b) (834 SE2d 549) (2019). See also *Howell v. State*, 307 Ga. 865, 875 (3) (838 SE2d 839) (2020) (same).

Therefore, we conclude that, under the circumstances of this case, it is highly probable that the admission of the evidence

concerning the Strode incident did not contribute to the jury's verdict. See *Howell*, 307 Ga. at 875-76 (3) (Rule 404 (b) evidence erroneously admitted harmless in light of otherwise strong evidence of defendant's guilt); *Jackson v. State*, 306 Ga. 69, 81 (2) (c) (829 SE2d 142) (2019) (same); *Scott v. State*, 357 Ga. App. 289, 295 (1) (b) (850 SE2d 477) (2020) (erroneous admission of Rule 404 (b) evidence to show identity harmless in light of other evidence of defendant's guilt).

2. Williams also contends that the trial court erred by admitting his statements to police about the Strode incident without first conducting a *Jackson-Denno*[6] hearing to determine whether those statements were voluntary. We need not decide whether the trial court erred, though, because we determine that any error in the admission of the evidence was harmless. "Even an error of

---

[6] Under the Fourteenth Amendment to the United States Constitution, "[a] defendant who objects to the admission of [his] statements to the police is 'entitled to a fair hearing in which both the underlying factual issues and the voluntariness of [his] confession are actually and reliably determined.'" *Reid v. State*, 306 Ga. 769, 773 (2) (a) (833 SE2d 100) (2019) (quoting *Jackson v. Denno*, 378 U.S. 368, 380 (III) (84 SCt 1774, 12 LE2d 908) (1964)).

16

constitutional magnitude may be considered harmless if the State can prove beyond a reasonable doubt that the error did not contribute to the verdict[.]" *Dunn v. State*, 312 Ga. 471, 480 (3) (863 SE2d 159) (2021) (citation and punctuation omitted). See also *Armstrong v. State*, 310 Ga. 598, 605 (3) (852 SE2d 824) (2020).

In the statements at issue, Williams denied that he inflicted serious injury on Strode — admitting only that he slapped him once open-handed — and attempted to justify this action by asserting that Strode had attempted to rape Ranow. We have determined that the admission of the Strode-related evidence, which would include the statements Williams made justifying the attack, was harmless under the standard for nonconstitutional error. We further conclude under the standard for assessing errors of constitutional magnitude that the record shows beyond a reasonable doubt that the evidence of Williams's self-serving statements to the Gwinnett County Police sergeant did not contribute to the verdict and thus that any error

was harmless.[7]

*Judgment affirmed. All the Justices concur.*


Decided March 8, 2022.

Murder. Gwinnett Superior Court. Before Judge Batchelor.

*Drake & Estes, Tracy S. Drake, Scott A. Drake*, for appellant.

*Patsy Austin-Gatson, District Attorney, Christopher N. DeNeve, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, William C. Enfinger, Assistant Attorney General*, for appellee.

---

[7] Williams does not argue that the errors we have assumed and determined to be individually harmless resulted in cumulative prejudice mandating a new trial, and in light of the other evidence in the case, and from our review of the record we discern no cumulative prejudice warranting reversal under either of the applicable harmless error standards. See *State v. Lane*, 308 Ga. 10, 17-18 (1) (838 SE2d 808) (2020) ("[E]ven in the evidentiary context, a defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors.").