314 Ga. 767
FINAL COPY

S22A0809.  PRITCHETT v. THE STATE.

MCMILLIAN, Justice.

Douglas Edwin Pritchett appeals his conviction for malice murder in connection with the death of Richard Danley.[1] On appeal, Pritchett asserts that the trial court erred in denying his amended motion for new trial because (1) his conviction was based upon insufficient evidence; (2) the trial court improperly admitted the

---

[1] Danley was killed on July 8, 2017. On October 12, 2017, a Gilmer County grand jury indicted Pritchett in connection with Danley's death, charging him with malice murder (Count 1); three counts of felony murder (Counts 2-4); aggravated assault with intent to murder (Count 5); aggravated assault (Count 6); and aggravated battery (Count 7). Pritchett was tried before a jury from February 27 to March 7, 2019, and convicted on all counts. Pritchett was sentenced to life in prison for malice murder under Count 1; Counts 2-4 were vacated by operation of law; and Counts 5-7 were merged into Count 1 for sentencing purposes.  Pritchett's trial counsel filed a timely motion for new trial on March 29, 2019, which was amended through new counsel on January 21, 2020. Following a hearing, the trial court entered an order denying the motion as amended on August 2, 2021. Pritchett filed a timely notice of appeal, but the appeal was stricken from this Court's docket and the case remanded to the trial court for a determination as to whether Pritchett's then-counsel would be allowed to withdraw from the case. On remand, Pritchett's counsel filed a motion for withdrawal, which the trial court granted. New appellate counsel was appointed, and this case was subsequently re-docketed to the April 2022 term of this Court and submitted for a decision on the briefs.

State's evidence proffered under OCGA § 24-4-404 (b) ("Rule 404 (b)"); and (3) he received ineffective assistance of counsel. He also asserts that he is entitled to a new trial based on the cumulative and collective prejudice resulting from trial court error and the deficient performance of his trial counsel. We disagree and affirm.

The parties stipulated at trial to the following facts. On July 8, 2017, Danley had been living with Pritchett in Pritchett's home in Gilmer County for approximately four to five months. And it was at Pritchett's home on July 8 that Pritchett shot Danley multiple times with a .40-caliber Smith and Wesson handgun, killing him. The parties also stipulated that a plastic "Mountain Lake Ice" bag (the "ice bag") was recovered from underneath Danley's body.

Viewed in the light most favorable to the verdict, the evidence at trial showed that Pritchett called 911 on the evening of July 8, 2017, around 5:35 p.m. to report "a home invasion shooting." An extended pause occurred after the operator asked Pritchett his name, and then the line disconnected. The 911 operator attempted to call Pritchett back three times before finally reaching him, about

2

four to five minutes later, on the fourth try. Pritchett told the operator that Danley, whom he described as "an acquaintance," came at him with a knife and that Pritchett thought that he had fired a few shots at Danley in the chest; then the line disconnected again.

First responders and law enforcement officers were dispatched to Pritchett's home. When they arrived, they saw a car sitting in the driveway and Pritchett on the porch of the home, talking on the phone. Pritchett, who had an injury to his nose and blood on his clothing, told the police that the victim was inside his home.

When the first officer entered Pritchett's home, he saw a silver pistol and a knife near the threshold of the front door. Danley was lying on the floor near the kitchen and dining area of the home about ten or twelve feet from the front door. The officer said that it was "very evident" that Danley was dead and his body was lying in a pool of blood.

During a later search, investigators recovered a loaded gun on the front porch near the front door and a knife on the floor just inside

the threshold. No blood was located in the vicinity of the knife, and there was no blood trail leading from the knife to the body. The majority of the cartridge casings were found inside the house in the kitchen, but police also found a number of spent shell casings and blood droplets on the front porch. Police discovered the empty ice bag under Danley's body clutched in his left hand,[2] with a spent shell casing between his legs. The projectiles recovered from the scene and from the victim's body, along with the spent casings collected at the scene, were determined to have been fired from the gun found on the front porch. Later testing also showed Danley's DNA on the knife and the gun, along with DNA profiles from other unidentified individuals. Pritchett's DNA was not found on the weapons.

Pritchett told the police at the scene that he and Danley had gotten into a physical altercation over $300 that Danley claimed Pritchett owed him. Pritchett said that following the fight, Danley left the home and returned with a knife and attacked Pritchett, who then shot Danley in self-defense. Gunshot residue was found on

---

[2] Earlier, police had observed ice in the blender.

Pritchett's hands, but his hands showed no signs that he had been involved in a physical fight. Danley's hands also showed no signs that he had been fighting. A later examination of Pritchett's phone records showed that he called a friend before calling 911 to report the shooting. The friend testified at trial that Pritchett told him that a man had come into his home while Pritchett was asleep and attacked him with "a shovel . . . or something." Pritchett told the friend that "he woke up on the floor and that boy was beating on him and he got his hands on a gun and shot him." No shovel was found at the scene.

Elaina Coffee, a GBI special agent and crime scene specialist, testifying as an expert for the State, opined that the evidence found at the crime scene was not consistent with Danley being shot as he entered the home with a knife, as no knife was found near the body. Rather, Agent Coffee stated the evidence was consistent with Danley already being in the home when he was shot. Agent Coffee also testified that the evidence was not consistent with Danley's being on top of Pritchett beating him when the shots were fired.

Danley was pronounced dead at the scene, and a later autopsy revealed that there were six gunshot wounds to his body, three of which were fired into his back. The medical examiner determined from her examination of Danley's body that the cause of his death was multiple gunshot wounds.

The State also presented Rule 404 (b) evidence from four witnesses, and that evidence will be discussed further in Division 2 below.

1. Pritchett asserts that the evidence at trial was insufficient to support his conviction because the State did not disprove that Pritchett was acting in self-defense when he shot Danley.

When considering whether the evidence at trial was sufficient to support a conviction as a matter of constitutional due process, the proper standard of review is whether the evidence, when viewed in the light most favorable to the jury's verdict, would have allowed a rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crime for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560)

(1979). And "[w]e leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts, and we do not reweigh the evidence." *Harris v. State*, 313 Ga. 225, 229 (2) (869 SE2d 461) (2022) (citations and punctuation omitted). In this case, not only did the State bear the burden of proving beyond a reasonable doubt that Pritchett was guilty of the crimes charged against him, it also had the burden of disproving Pritchett's claim of justification based on self-defense beyond a reasonable doubt. See *McCray v. State*, 301 Ga. 241, 243 (1) (799 SE2d 206) (2017) (where a defendant effectively raises an affirmative defense of justification or self-defense, the State has the burden of disproving that defense beyond a reasonable doubt); *Mosby v. State*, 300 Ga. 450, 451 (1) (796 SE2d 277) (2017) (same). Whether the State met its burden in this case was a question for the jury. See *Blair v. State*, 273 Ga. 668, 668 (1) (543 SE2d 685) (2001) ("It was a question for the jury whether the circumstances justified [defendant's] use of a deadly weapon against the victim."); *Akins v. State*, 269 Ga. 838, 839 (1) (504 SE2d

7

196) (1998) (jury is to determine "the question whether the circumstances of the confrontation between appellant and the victim were such as to excite the fears of a reasonable person that he had to use deadly force in order to prevent the use of deadly force against him" (citation and punctuation omitted)).

Pritchett asserts that the State failed to disprove his claim of self-defense as no independent witness observed what happened that day and "no objective, non-speculative, relevant ballistics evidence, DNA evidence, fingerprint evidence, or other scientific evidence" was presented that directly countermanded Pritchett's claimed defense. However, it is well settled that, "[a]lthough the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." *Jackson v. State*, 307 Ga. 770, 772 (838 SE2d 246) (2020) (citation and punctuation omitted). And contrary to Pritchett's argument, the State presented evidence at trial that authorized the jury to reject Pritchett's claim of self-defense.

For example, Pritchett told conflicting stories about what

occurred, and these stories were also inconsistent with the physical evidence. Pritchett told police that Danley first left Pritchett's home after the two men had fought over money, resulting in the injuries to Pritchett's nose, and that after Danley later returned with a knife, Pritchett then shot Danley in self-defense. However, the evidence showed that neither Danley nor Pritchett had injuries to their hands consistent with having been in a fight. Moreover, the knife was found ten to twelve feet from Danley's body, and there was no blood trail leading from the knife to the body to suggest that Danley somehow moved away from the knife after he was shot. Additionally, three of the multiple gunshots inflicted on Danley by Pritchett entered through Danley's back.

In another version of the events, Pritchett told a friend that he was asleep when Danley attacked him with a shovel, so Pritchett shot him, but no shovel was found at the scene. And when Danley's body was moved, police discovered that he was clutching the empty ice bag, not a knife or a shovel. Agent Coffee also gave her expert opinion that her analysis of the crime scene was not consistent with

either of Pritchett's versions of events.

This and other evidence at trial was sufficient to authorize the jury to find beyond a reasonable doubt that Pritchett did not act in self-defense and was not otherwise justified when he shot Danley. See *Slaughter v. State*, 278 Ga. 896, 897 (608 SE2d 227) (2005) (evidence sufficient to enable jury to find beyond a reasonable doubt that defendant was not acting in self-defense when he shot the victim and that he was guilty of malice murder); *Clark v. State*, 271 Ga. 27, 29 (1) (518 SE2d 117) (1999) (Where defendant's various versions of events changed materially with each iteration, "[t]he jury was entitled to accept the circumstantial evidence of an intentional act, and reject the claim that the shooting . . . was done in self[-]defense."). Thus, we conclude that the evidence was sufficient to sustain the guilty verdict of murder as a matter of constitutional due process. See *Jackson*, 443 U.S. at 319 (III) (B).[3]

---

[3] Pritchett also argues that the trial court abused its discretion when it declined to grant a new trial pursuant to the "general grounds" set forth in OCGA §§ 5-5-20 and 5-5-21. However, "an *appellate* court does not review the merits of the general grounds. Instead, this Court's review of the trial court's

2. Pritchett next argues that the trial court erred in admitting the State's evidence of three prior incidents involving Pritchett to show plan, preparation, knowledge, and motive under Rule 404 (b). Pritchett asserts that because all of the Rule 404 (b) evidence involved incidents that took place after he had been drinking, the incidents only showed that Pritchett had the propensity to be abusive, violent, and angry after drinking. Although we agree that the other-acts evidence should not have been admitted, we conclude that the admission of this evidence was harmless error.

Prior to trial, the State filed a motion to present Rule 404 (b) evidence of several prior incidents involving Pritchett: (1) a 2010 arrest and indictment on an aggravated assault charge; (2) an arrest for disorderly conduct in May 2017; and (3) a series of incidents involving Pritchett's girlfriend, which took place within months before Danley's death. Following several hearings on the Rule 404 (b) motion, the trial court ruled that the evidence would be

ruling on the general grounds is limited to sufficiency of the evidence under *Jackson v. Virginia." Ward v. State*, 313 Ga. 265, 268 (2) n.5 (869 SE2d 470) (2022) (citation and punctuation omitted; emphasis in original).

11

admissible and later entered a written order admitting the evidence "to show motive (to use force, the threat of force and violence, to control a domestic partner and individuals with whom the Defendant is in a relationship), plan (to control disclosure of and [the] nature of information, controlling the narrative and altering facts), and knowledge (the previous firing of a weapon inside of his home and towards another person)."

At trial, the State presented the Rule 404 (b) evidence through its first four witnesses, and the trial court gave an instruction limiting the jury's use of the evidence both before these witnesses testified and in the court's final charge to the jury. These charges instructed the jurors to consider the evidence "for the limited purpose for which it is admitted, showing and illustrating, if it does, the accused's preparation or plan, knowledge or motive" and "not for any other purpose" or "consideration." The first incident was presented through a crime scene investigator for the Gilmer County Sheriff's Office, who testified that in December 2010, police were called to Pritchett's home to investigate reports of an illegal liquor

operation.

When the investigator arrived at the scene, he observed a rifle sticking up out of the snow and various spent cartridges and shells on the front porch. The interior of the home was in "complete disarray," with things thrown everywhere and bullet holes in the ceiling. The investigator said that it appeared from the scene that Pritchett and another person had been there drinking when a fight broke out. Pritchett, who was at the scene, admitted that he had been in a fight. He told the investigator that he had awakened with someone hitting him, so he began to fight back, and the fight got worse. Pritchett said that he might have fired a shot or two at the other man, and he hoped that he had "hit the SOB."[4] Photographs of Pritchett from the incident were also admitted in which Pritchett appeared injured, and the investigator testified that the injuries were inflicted by someone else.

---

[4] Although the State presented evidence that Pritchett was charged with aggravated assault in connection with this incident, the investigator testified that he did not know the disposition of the charge because he was never asked to go to court about the incident.

Regarding the second incident, the State presented evidence through a city of Rome police officer that Pritchett was arrested for disorderly conduct on May 12, 2017, less than two months before Danley's death. The officer testified that he was called to a house in Rome after police received a report that Pritchett was threatening someone. Bodycam video of the incident was played for the jury, which showed the officer speaking with those at the scene, placing Pritchett under arrest for disorderly conduct after he used profanity in front of children, and putting Pritchett in the back seat of a patrol car. As the officer drove Pritchett away from the scene, a camera on the dashboard was filming through the patrol car's windshield, while another camera was filming Pritchett in the back seat. These video recordings were also played for the jury. The dashcam footage shows the officer driving slowly through a residential neighborhood, with no evidence of abrupt or hard braking, when an audible bump can be heard on the video, followed by Pritchett's announcement that the officer failed to buckle him into a seat belt and then slammed on the brakes, causing Pritchett to hit his head. However,

14

the back-seat video recording from the same timeframe shows Pritchett first look in the direction of the front seat, then throw himself at the partition between the front and back seats of the patrol car. At that point, Pritchett claims, as also heard on the dashcam video, that the officer had slammed on his brakes, causing Pritchett injury. The officer admitted at trial that he initially failed to put Pritchett in a seat belt, but he said that he never slammed on his brakes.[5]

As for the third incident, the State presented testimony from Pritchett's former girlfriend and her sister regarding a series of altercations that occurred some months before Danley's death when the two women were on vacation with Pritchett in South Carolina. Pritchett's girlfriend testified that in one incident, Pritchett, who had been drinking, hit the girlfriend in the head, causing her to fall

---

[5] Contrary to Pritchett's argument that the evidence was introduced to show he had the propensity to become violent or abusive when drinking, the video recording of this incident did not show any acts of violence against others by Pritchett, despite evidence that Pritchett had been drinking that day. Although Pritchett was uncooperative and verbally challenged the officer when he attempted to perform field sobriety tests to determine whether Pritchett could legally drive himself from the scene, Pritchett was not violent or physically abusive toward anyone during this incident.

into the television in their motel room. The girlfriend also testified that on the same vacation he elbowed her in the chest when she and her sister got back in the car after shopping because Pritchett thought they had taken too long. The girlfriend's sister testified that during the shopping incident, she saw Pritchett hit the girlfriend over and over with his fist. On that trip, the sister also saw Pritchett hit the girlfriend in the back of the head with a duffel bag as she lay in the bed because she would not get up when he asked.

(a) Rule 404 (b) provides that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith[,]" but it may "be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." See also *State v. Jones*, 297 Ga. 156, 159 (2) (773 SE2d 170) (2015) ("Rule 404 (b) explicitly recognizes the relevance of other acts evidence offered for a permissible purpose and, at the same time, prohibits the admission of such evidence when it is offered *solely* for the impermissible

purpose of showing a defendant's bad character or propensity to commit a crime." (emphasis in original)). Therefore, the rule "is, on its face, an evidentiary rule of inclusion which contains a non-exhaustive list of purposes other than bad character for which other acts evidence is deemed relevant and may be properly offered into evidence." Id. However, even evidence offered for a proper purpose under Rule 404 (b) may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403.

Accordingly, Georgia courts employ a three-part test to determine if the evidence of a defendant's other acts is admissible, which requires that the proponent of the evidence show:

> (1) that the evidence is relevant to an issue in the case other than the defendant's character; (2) that the probative value of the evidence is not substantially outweighed by its undue prejudice; and (3) that there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act.

17

*Strong v. State*, 309 Ga. 295, 300 (2) (845 SE2d 653) (2020). See also

*Olds v. State*, 299 Ga. 65, 69-70 (2) (786 SE2d 633) (2016). On appeal,

we review the trial court's decision to admit evidence under Rule 404

(b) for an abuse of discretion. See *Kirby v. State*, 304 Ga. 472, 479 (4)

(819 SE2d 468) (2018).

(b) The State introduced evidence of the 2010 arrest and

indictment for aggravated assault and the 2017 arrest for disorderly

conduct to support the argument that Pritchett had the preparation

or plan to manufacture his claims of justification and self-defense in

connection with Danley's death and stage the crime scene to support

this fabricated defense.

"Relevant evidence" is defined under OCGA § 24-4-401 as

"evidence having any tendency to make the existence of any fact that

is of consequence to the determination of the action more probable

or less probable than it would be without the evidence." "Rule 404

(b) does not define 'plan' or otherwise set limits on its scope." *Morrell*

*v. State*, 313 Ga. 247, 256-57 (2) (a) (869 SE2d 447) (2022) (citations

and punctuation omitted). In prior cases addressing the proper use

18

of Rule 404 (b) evidence to show plan or preparation in connection with a defendant's participation in the crimes charged, this Court has applied federal case law to recognize "two general categories of 'plan' evidence under Rule 404 (b): the other-acts evidence shows the planning of or preparation for the charged offense, or it tends to prove that the defendant employed a 'common scheme' to commit a series of similar crimes."[6] Id. at 257 (2) (a) (citation and punctuation omitted). With respect to the "common scheme" method of proving plan, we have explained that "[t]his approach blends the purpose of *plan* with the purpose of *identity* — showing that a distinctive plan was used tends to prove that the same person executed both plans." *Heard v. State*, 309 Ga. 76, 87 (3) (e) (844 SE2d 791) (2020) (emphasis in original). And when other-acts evidence is admitted to prove identity, it "must satisfy a particularly stringent analysis." Id. at 88 (3) (f) (citation and punctuation omitted). "The physical

---

[6] "Because each of these Georgia evidence rules is modeled on its counterpart in the Federal Rules of Evidence, we may look to federal appellate precedents interpreting the pertinent federal rule for guidance in applying the state provision." *Harris v. State*, 314 Ga. 238, 264 (3) (a) (875 SE2d 659) (2022).

similarity must be such that it marks the offenses as the handiwork of the accused. The extrinsic act must be a 'signature' crime, and the defendant must have used a modus operandi that is uniquely his." Id. (citation and punctuation omitted).

Neither incident fits within the definitions of preparation or plan under Rule 404 (b). The other-acts evidence had nothing to do with the planning of the charged offenses, nor were they part of a "common scheme to commit a series of similar crimes." *Morrell*, 313 Ga. at 257 (2) (a) (citation and punctuation omitted). For one thing, the 2010 incident occurred over six years before the crimes charged in this case, and there is no evidence that the 2010 acts were part of his plan to shoot Danley. See *Heard*, 309 Ga. at 87 (3) (e) (no evidence that defendant's later acts in stealing a car with children in it, abandoning the children, and later burning the car was part of a plan to steal another vehicle, use it to drive to a robbery, commit a murder, and later burn the vehicle).

Moreover, at trial, the State failed to show that the 2010 incident was part of a "common scheme to commit a series of similar

20

crimes." *Heard*, 309 Ga. at 87 (3) (e) (citation and punctuation omitted). The 2010 incident and the crime here shared some common elements — Pritchett claimed that he had been awakened by someone beating him and they both occurred at Pritchett's home — but that is where the similarity ends. In the 2010 incident, the crime being investigated was an illegal liquor operation, and it was during that investigation that the investigator found Pritchett at home with it in disarray and bullet holes in the ceiling.[7] It appears that it was only in the course of speaking with the investigator that Pritchett admitted that he had been in a fight and that he had shot at someone, which led to his arrest for aggravated assault. At trial, the evidence was unclear about who the victim in the 2010 incident was or his relationship with Pritchett or any of the other circumstances of the fight and attempted shooting.[8] Thus, we fail to

---

[7] At the scene of Danley's shooting, bullet holes were also found in the ceiling, but the record is not clear whether these bullet holes were the same ones observed in 2010.

[8] We note that the purported victim in the 2010 incident was called to testify at one of the Rule 404 (b) hearings, but he asserted his Fifth Amendment right against self-incrimination.

see how a previous claim that Pritchett perhaps had been a victim of an attack under unknown circumstances made it more probable that, years later, Pritchett planned the story that he was the victim in an unprovoked attack by Danley. See *Heard*, 309 Ga. at 90 (3) (f) ("Because the State did not establish that the features of the charged crimes and the later crimes, viewed individually or as a whole, marked those crimes as the unique 'signature' of the same perpetrator, the trial court abused its discretion by admitting evidence of those acts to show a distinctive plan and identity."); *United States v. LeCompte*, 99 F3d 274, 278 (II) (8th Cir. 1996) (prior sexual abuse committed against different victim eight to ten years prior did not establish a "plan" because the evidence was "relevant to 'plan' or 'preparation' only insofar as it tends to prove a propensity to commit crimes, which Rule 404 (b) prohibits").

While the 2017 incident occurred closer in time, it involved a dissimilar disorderly conduct arrest for using profanity in front of children and the staging of an injury in the back seat of a police car; thus, this incident also is not relevant to the planning of the charged

22

offenses, nor was it part of a "common scheme to commit a series of similar crimes." *Morrell*, 313 Ga. at 257 (2) (a) (citation and punctuation omitted). Although the State argued in closing that the police car video showed that Pritchett was willing to injure himself to control the narrative and that he may have injured his own nose to support his claim of self-defense, that argument essentially is that Pritchett had a propensity to make up injuries to get out of situations, but not that his actions in the back of the police car showed how Pritchett planned to shoot Danley and claim self-defense. Thus, we conclude that the trial court erred in admitting the 2010 and 2017 other-acts evidence to show plan or preparation.

The trial court also admitted the evidence of the 2010 incident at Pritchett's home to support that Pritchett had knowledge about how to shoot at someone inside a house. But, "knowledge" under Rule 404 (b) refers to "a special skill like safecracking, bomb-making, or document forgery or to specific knowledge based on past experience[.]" *Rouzan v. State*, 308 Ga. 894, 899 (2) (843 SE2d 814) (2020). See also *Harris v. State*, 314 Ga. 238, 266 (3) (c) (875 SE2d

23

659) (2022) ("Appellant's sexual activities gave no indication that he had any knowledge related to how to kill a child by leaving the child in a hot vehicle."). The 2010 incident provided no specialized knowledge to Pritchett about how to shoot someone inside a house, nor does it support that Pritchett had any "specific knowledge" based on the experience about how to shoot someone inside a house, so the trial court also erred in admitting the 2010 other-acts evidence on this basis. See *Rouzan*, 308 Ga. at 899 (2).

With respect to the incidents involving Pritchett's girlfriend, the State proffered the evidence to show that Pritchett had the motive "to use violence to control anyone around him," and, in its written order, the trial court admitted the evidence for the purpose of showing a motive to use force, or the threat of force and violence, "to control a domestic partner and individuals with whom [Pritchett] was in a relationship," based on a finding that, as Pritchett's roommate, Danley "could be considered a domestic partner pursuant to the statutes."

"Motive is the reason that nudges the will and prods the mind

24

to indulge the criminal intent." *Kirby*, 304 Ga. at 486 (4) (b) (citation and punctuation omitted). "To properly show motive, the extrinsic evidence must be logically relevant and necessary to prove something other than the accused's propensity to commit the crime charged." *Strong*, 309 Ga. at 312 (d) (2) (citation and punctuation omitted). "To rule otherwise would make all prior robberies admissible in any robbery case, all prior murders admissible in any murder case, and so on." *Kirby*, 304 Ga. at 487 (4) (b) (citation and punctuation omitted).

Here, the State presented little evidence of Pritchett's motive for shooting Danley, but it argued in closing that Pritchett shot Danley because Pritchett "was aggravated with him" or in retaliation for being punched in the nose, even though the State alternatively argued that Pritchett punched himself in the nose to stage the scene. The State did not argue that Pritchett shot Danley to control him, so it is difficult to discern how Pritchett's violence toward his girlfriend while attempting to control her was relevant. That makes this case different from *Smart v. State*, 299 Ga. 414,

25

418-19 (2) (b) (788 SE2d 442) (2016), upon which the State relies. There, we determined that the testimony of a defendant's ex-wife regarding defendant's acts of violence against her was relevant to show why the defendant might have used violence against his current wife. And we held that the testimony was admissible in his trial for the murder of his current wife because it "demonstrated that the violence was a mechanism for control of his intimate partners" and there was very little evidence to show why defendant "lashed out at his wife."

Moreover, even if we assume, without deciding, that the trial court was correct in characterizing Danley as a "domestic partner" and in a somewhat similar relationship to Pritchett as his girlfriend, the trial court admitted the evidence to support that Pritchett committed violent actions against those with whom he had a relationship to control them. This stated basis goes to propensity and is not a proper purpose to admit this evidence. See *Strong*, 309 Ga. at 312 (d) (2) (concluding that the State's argument that Rule 404 (b) evidence illustrated defendant's motive "to control other

people with violence . . . is a classic improper propensity argument, focusing on [the defendant's] violent character" (citation and punctuation omitted)); *Kirby*, 304 Ga. at 487 (4) (b) (holding that the State's proffer of other-acts evidence showing the defendant's "'inclination' to use violence to obtain money and sex . . . is a classic improper propensity argument, . . . identifying his motive to act in far too generic a fashion"). Thus, we conclude that the trial court erred in admitting this other-acts evidence against Pritchett.

(c) However, "[e]videntiary errors require reversal only if they harm a defendant's substantial rights." *Williams v. State*, 313 Ga. 443, 448 (1) (870 SE2d 397) (2022) (citation and punctuation omitted). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Kirby*, 304 Ga. at 478 (3) (c) (citation and punctuation omitted). And in making that determination, "we review the record de novo and weigh the

27

evidence as we would expect reasonable jurors to have done so." *Sams v. State*, 314 Ga. 306, 313 (3) (875 SE2d 757) (2022) (citation and punctuation omitted).

Here, the evidence supporting Pritchett's commission of the murder and undermining his claim of self-defense was substantial. It is undisputed that Pritchett shot Danley, and the only question was whether Pritchett shot in self-defense. The State's expert testified that the evidence at the crime scene did not support Pritchett's versions of events, and the jury was presented with testimony describing, and photographs showing, the evidence upon which the expert based her opinion. The jury also had reason to be skeptical of Pritchett's description of what happened because Pritchett told his friend one version of events (Danley attacked Pritchett with a shovel while Pritchett was asleep) shortly before he gave the police a different version of what had occurred (that Danley came at him with a knife after the two had fought over money). The first version of events was undercut by the absence of a shovel at the scene. Likewise, the version Pritchett gave police was contradicted

by the evidence at the scene. Pritchett never claimed that there was a struggle after Danley retrieved the knife;[9] rather, he said he shot Danley as he approached with the knife, and his counsel argued that the shooting occurred in the "short enclosed area" where Danley's body was found. Yet the knife with Danley's DNA on it was found ten feet away from Danley, who instead had the ice bag clutched in his hand, and there was melting ice in the blender suggesting that Danley was in the process of making something in the blender when he was shot. Also, although Pritchett had injuries to his nose, neither he nor Danley had any injuries to their hands consistent with the two having been in a fight.

On the other hand, the other-acts evidence had little bearing on the issues in the case. The State's theory that Pritchett staged the scene was amply supported by the physical evidence and Pritchett's inconsistent statements and conduct after the crimes;

---

[9] In fact, his counsel conceded in his closing argument that there had never been "a fight" between the two men and Pritchett never "got any blows in." Rather, he argued that the evidence showed only that Danley punched Pritchett in the nose.

whether Pritchett had knowledge about how to shoot at someone inside a house was not seriously contested; and the State was not required to show motive to prove the crimes. See *Romer v. State*, 293 Ga. 339, 341 (1) (b) (745 SE2d 637) (2013) (explaining that motive is not an essential element of a crime). In closing argument, the State did not mention the other-acts evidence involving Pritchett's girlfriend or argue that it supported a motive for Danley's shooting; nor did the State refer to the 2010 aggravated assault arrest and indictment or argue that it showed plan or preparation.[10]

Moreover, the trial court instructed the jury to consider this other-acts evidence for preparation, plan, knowledge, or motive and for no other purposes. We recognize the tension between the trial court's instructions to the jury to consider the other-acts evidence for these purposes, and our conclusion that the evidence was not relevant to these purposes. But we presume that the jury followed those instructions and did not use the other-acts evidence

---

[10] As explained above, the State only referred to the 2017 incident in the back of the police car in its closing argument to support that Danley had injured himself to fabricate his claim of self-defense.

improperly to support that Pritchett had a propensity towards violence. See *Thomas v. State*, 314 Ga. 681, 688 (1) (878 SE2d 493) (2022) (in considering whether admission of other-acts evidence was harmless, "we presume that the jury followed the instructions not to consider it for any other purpose").

We recognize that the admission of this other-acts evidence carried a risk of prejudice to Pritchett in no small part because the State chose to emphasize the three prior incidents through the first four witnesses that it called at trial. This case presents a close question, but in light of the substantial evidence of Pritchett's guilt and after conducting a de novo review and weighing the evidence as reasonable jurors would, we conclude that it is highly probable that the error in admitting the other-acts evidence did not contribute to the verdict finding Pritchett guilty of malice murder. See *Thomas*, 314 Ga. at 688 (1) ("In the light of the strong independent evidence of [the defendant's] guilt and the trial court's thorough instructions limiting the jury's use of the other-acts evidence, we conclude that it is highly probable that any error in the admission of the other-acts

evidence did not contribute to the guilty verdicts against [the defendant].") (cleaned up). Thus, the admission of this evidence provides no basis for reversal. See *Moore v. State*, 307 Ga. 290, 294 (2) (835 SE2d 610) (2019).

3. Pritchett further asserts that he received ineffective assistance of counsel at trial.

> In order to succeed on his claim of ineffective assistance, [Pritchett] must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. If an appellant fails to meet his or her burden of proving either prong of the [*Strickland v. Washington*] test, the reviewing court does not have to examine the other prong. In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.

*Lyons v. State*, 309 Ga. 15, 25 (8) (843 SE2d 825) (2020) (citation and punctuation omitted). See also *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

(a) Pritchett contends that his trial counsel provided ineffective assistance when he failed to object to improper opinion testimony

from GBI Special Agent Ryan Hilton, who led the investigation into Danley's death, but who was not qualified as an expert at trial. Pritchett asserts that his trial counsel should have objected when Agent Hilton gave alleged expert testimony regarding the ice bag, Pritchett's injuries, and blood evidence.

Under OCGA § 24-7-701 (a) ("Rule 701 (a)"), a lay witness may testify "in the form of opinions or inferences that are rationally based on the witness's perception, helpful to a clear understanding of the determination of a fact in issue, and not based on scientific, technical, or other specialized knowledge." *Glenn v. State*, 302 Ga. 276, 279-80 (II) (806 SE2d 564) (2017). Moreover, "lay witnesses may draw on their professional experiences to guide their opinions without necessarily being treated as expert witnesses." *Bullard v. State,* 307 Ga. 482, 492 (4) (837 SE2d 348) (2019) (citation and punctuation omitted).

(i) *The ice bag*: Agent Hilton testified that when Danley's body was moved, investigators discovered the plastic ice bag he was clutching in his left hand, which was collected and preserved as

33

evidence. The agent later examined the bag for defects, such as tears, cuts, rips and holes, and discovered seven holes, one being the top opening of the bag. Agent Hilton testified that one hole, which measured approximately one to two centimeters, could be consistent with a .40-caliber projectile entering the bag and that two smaller holes, measuring "probably three to four millimeters," could be consistent with fragments from a .40-caliber projectile. Nevertheless, the agent clarified that he could not say definitively that a .40-caliber projectile caused the holes.

We conclude that the agent's opinion that the holes in the bag could have been consistent with a .40-caliber projectile "was rationally based on inferences he formed from his review of the evidence and his prior observations." *Harris v. State*, 309 Ga. 599, 604 (2) (a) (847 SE2d 563) (2020) (holding that detective's testimony as to how victim was shot was admissible where it was based on detective's own review of the evidence and his prior observations of gunshot wounds). See also *Thornton v. State*, 307 Ga. 121, 128 (3) (c) (834 SE2d 814) (2019) (detective's opinion that appellant was the

only person who had been in a position to shoot victim was properly admitted under Rule 701 (a)). And the agent emphasized that he could only say that the holes were generally consistent with a .40-caliber round, but could not state definitively that the holes were caused by .40-caliber shells. Moreover, this evidence was helpful to the jury in determining how the events surrounding Danley's shooting transpired. Accordingly, because this evidence would have been admissible under Rule 701, Pritchett has not shown that his counsel would have been successful in raising an objection to the agent's testimony as improper expert testimony, and his ineffective assistance of counsel claim fails on this ground. See *Hampton v. State*, 295 Ga. 665, 670 (2) (763 SE2d 467) (2014) ("[T]he failure to make a meritless . . . objection does not provide a basis upon which to find ineffective assistance of counsel.").

(ii) *Pritchett's injuries*: Agent Hilton testified that he supervised the transport of Pritchett from the crime scene to the police station, where the agent executed a warrant to gather evidence from Pritchett's person. Agent Hilton observed that

35

Pritchett had a "busted nose," and as part of the execution of the warrant, he took photographs of this injury, which were later published to the jury at trial. In describing the injuries depicted in the photographs at trial, Agent Hilton said that Pritchett had "bruising of the bridge of the nose, starting in between the eyebrows and going about to the midline section down toward the point of the nose," in the middle of which was an abrasion that had already begun scabbing over. Agent Hilton testified that this injury could be consistent with someone punching him in the nose but could have also been caused in another manner. Agent Hilton further testified that the injury did not appear consistent with multiple blows to the face because there was only one area where the skin was missing or broken, and the remainder of the bruising "looked fairly symmetrical going down either side of the bridge of the nose, consistent with one injury."

Trial counsel testified at the hearing on the motion for new trial that Agent Hilton's testimony in this regard would not require specialized medical training except, perhaps, for the opinion that the

injuries appeared to have been caused by one punch and not multiple punches. Although trial counsel could not recall whether the defense argued that he had been hit once or multiple times, he said that "looking at it from two years back, my guess is . . . it was consistent with what we were saying happened, so I didn't care." And, in fact, the record reflects that trial counsel never argued that there were multiple blows, stating in closing that Danley "popped [Pritchett] in the nose and popped him good."

To establish deficient performance by his trial counsel, Pritchett must overcome a strong presumption that trial counsel's conduct "falls within the broad range of reasonable professional conduct" and demonstrate that his counsel "performed in an objectively unreasonable way, considering all circumstances and in the light of prevailing professional norms." *Smith v. State*, 296 Ga. 731, 733 (2) (770 SE2d 610) (2015) (citation and punctuation omitted). Moreover, "[t]rial tactics or strategy are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have

37

chosen them." *Watts v. State*, 308 Ga. 455, 460 (2) (841 SE2d 686) (2020) (citation and punctuation omitted). And "[t]he matter of when and how to raise objections is generally a matter of trial strategy." *Robinson v. State*, 278 Ga. 31, 36 (3) (c) (597 SE2d 386) (2004) (citation and punctuation omitted).

Here, Pritchett has failed to overcome the presumption that his trial counsel's decision not to object fell within the wide range of reasonable professional conduct. Pritchett has made no effort to argue or show that evidence that the injuries to his nose were caused by a single blow, as opposed to multiple blows, was inconsistent with, or undercut, the defense's strategy at trial. Accordingly, he has failed to establish that his counsel's performance was deficient in failing to object to this evidence.

(iii) *Blood evidence*: Agent Hilton clarified that he was not an expert on blood pattern analysis but he had some training in what blood looks like and blood directionality. The agent testified that Pritchett was wearing khaki shorts at the time of the shooting, and he collected the shorts from Pritchett pursuant to a search warrant.

Pritchett asserts that his trial attorney should have objected when Agent Hilton identified suspected blood drops on the shorts at trial, which he said did not "have tails," and therefore appeared to show that "blood in liquid form hit the absorbent material traveling . . . perpendicular to the surface." He also contends that his trial counsel should have objected during the State's re-direct examination of Agent Hilton, when he testified that as soon as someone is shot, blood begins to come out of his body, so if Danley were shot where the knife was found, the agent would have expected to see blood there as well as where his body was located.

Trial counsel testified at the hearing on the motion for new trial that Agent Hilton's testimony on this point was information that the average juror might possess from his or her own experience: "Can the average juror say there's splatter of blood, and that means somebody got shot, sure." He also testified that you would not necessarily require an expert witness to testify that blood can show directionality or where the blood would pool. Trial counsel further testified that because Agent Hilton was testifying based on his

professional experience, he did not believe that this evidence was objectionable.

We conclude that this testimony was admissible under Rule 701. To the extent that the cited testimony could be considered opinion testimony, as opposed to Agent Hilton's observations of the shorts and the crime scene itself, we conclude that it was rationally based on inferences he formed from his review of the evidence and his prior observations of similar evidence and crime scenes. And the testimony was helpful to the jury in determining where in Pritchett's house Danley was shot. See *Harris*, 309 Ga. at 604 (2) (a); *Thornton*, 307 Ga. at 128 (3) (c). Thus, trial counsel was not deficient for failing to make a meritless objection. See *Hampton*, 295 Ga. at 670 (2).

(b) Pritchett also asserts that his trial counsel performed deficiently in asking, during cross-examination of Agent Hilton, for the agent's opinion on what had happened between Pritchett and Danley, as it elicited opinion testimony on the ultimate issue in the case in violation of OCGA § 24-4-704 ("Rule 704"), and in failing to object to the agent's answer to the question.

40

During cross-examination, Pritchett's trial counsel asked Agent Hilton whether he had formed an opinion "as to how this occurred, the relative positions of the two parties when the shooting occurred." A further line of questioning ensued on whether Agent Hilton could properly testify as to the State's theory of the case. And when the agent began his answer, he first replied, "[W]hat I believed happened is, Mr. Pritchett got popped in the nose, got p****d off and shot this dude." Defense counsel then asked to withdraw the question and objected to this testimony as nonresponsive, but the trial court denied the request and overruled the objection. Trial counsel again objected when Agent Hilton testified that he approached the case with "an open mind," stating that the answer was "comment, that is, not factual, and that is certainly not responsive to my question," but was again overruled. The trial court allowed Agent Hilton to continue his testimony, during which he reviewed the evidence presented at trial and expressed his opinion on it. Agent Hilton also testified that he was somewhat familiar with the prior 2010 incident involving Pritchett, noting that Pritchett

41

admitted shooting at the other man in that incident and that he hoped he had hit him. When Agent Hilton began to testify as to what he would say, as a use-of-force instructor, regarding the case at bar, the trial court halted his testimony.

At the motion for new trial hearing, trial counsel testified that he did not believe that his question was open-ended and that he was just trying to establish the narrative of the investigation.[11] However, when it became apparent that the question was being treated as open-ended, he objected that Agent Hilton's testimony was beyond the scope of the question.

To the extent that Pritchett asserts that his trial counsel was deficient in failing to object to this testimony, the record demonstrated that his counsel raised two objections on the basis that the agent's answers were nonresponsive and improper

---

[11] Trial counsel's testimony that he was seeking only limited information is supported by the transcript. After the trial court stopped Agent Hilton's narrative response, trial counsel again stated that he never got an answer to his original question as to where the State contended the parties were standing when the shooting occurred and specifically asked Agent Hilton where the State believed Danley was standing when he was shot.

commentary, but the objections were overruled on each occasion. Pritchett does not appeal the trial court's decisions to overrule these objections. Moreover, although Pritchett asserts that trial counsel should have objected to Agent Hilton's testimony regarding the December 2010 incident as placing his character in issue, at the time that the testimony was given, the trial court had already ruled that the incident could come in under Rule 404 (b) as other-acts evidence. Thus, Pritchett has not shown that his counsel's decision not to object was unreasonable or that it fell outside the wide range of reasonable professional conduct. And to the extent that Pritchett asserts that the testimony was inadmissible under Rule 704 because it addressed the ultimate issue, subsection (a) of that statute provides that "testimony in the form of an opinion or inference otherwise admissible shall not be objectionable because it embraces an ultimate issue to be decided by the trier of fact." Accordingly, Pritchett has failed to demonstrate that his counsel performed deficiently in failing to further object to the testimony.

Pritchett also asserts, however, that his trial counsel was

43

deficient in asking Agent Hilton the question in the first place because it led to extensive opinion testimony as to the ultimate issue. At the motion for new trial hearing, Pritchett's trial counsel testified that he asked the question in order to establish the narrative of the State's investigation and as originally asked, the question addressed only Agent Hilton's opinion as to where Pritchett and Danley were standing when the shooting occurred. When Agent Hilton began to testify in a narrative form about the evidence that had been presented at trial, counsel objected to Agent Hilton's testimony as nonresponsive and improper commentary, but was overruled on two occasions.

It is well settled that "decisions about what questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel." *Snipes v. State*, 309 Ga. 785, 794 (3) (c) (848 SE2d 417) (2020) (citation and punctuation omitted). And although counsel's question led to an unanticipated result, Pritchett has failed to demonstrate that the decision to ask the question fell outside the wide range of reasonable professional

conduct. Pritchett asserts that Agent Hilton's testimony supported the State's case and improperly went to the ultimate issue, but

> counsel's reasonableness is evaluated in conjunction with the attendant circumstances of the challenged conduct with every effort made to eliminate the distorting effects of hindsight. Thus, deficiency cannot be demonstrated by merely arguing that there is another, or even a better, way for counsel to have performed.

*Richards v. State*, 306 Ga. 779, 782 (2) (a) (833 SE2d 96) (2019) (citations and punctuation omitted) (counsel's decision to elicit hearsay testimony from police investigator regarding witness statements that guided her investigation, but which defendant claimed improperly bolstered the State's case, did not amount to deficient performance). Under the circumstances, we cannot say that Pritchett has established that his trial counsel's performance was deficient in this regard.

(c) Pritchett also asserts that his trial counsel rendered deficient performance because he failed to object when the State elicited testimony from Agent Coffee, its expert witness, that a scale and a marijuana grinder were located in Pritchett's kitchen.

Pritchett contends that this testimony amounted to improper character evidence harmful to Pritchett.

However, Agent Coffee identified these objects during questioning asking her to describe what was depicted in a long list of photographs she took of the crime scene. The agent merely identified each object one time when it appeared in a photograph she took in the kitchen, which was used by both Danley and Pritchett, and then moved on to the next photograph. No testimony was presented as to whom these objects belonged (either Pritchett or Danley), nor was any evidence presented as to how the scales in the kitchen were used.

Under these circumstances, where the identification of these objects was only in passing and not linked to Pritchett specifically, the testimony did not amount to improper character evidence. See, e.g., *Goins v. State*, 310 Ga. 199, 206-07 (5) (850 SE2d 68) (2020) (Where "two comments about Appellant's having been in prison were brief and nonspecific, . . . such passing references . . . did not place his character in evidence." (citation and punctuation omitted)).

Thus, trial counsel was not deficient for failing to make a meritless objection. See *Hampton*, 295 Ga. at 670 (2).

4. Pritchett further asserts that he is entitled to a new trial based on the collective prejudice resulting from the trial court's errors and the "numerous instances" of ineffective assistance on the part of his trial counsel, citing *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020).

> To establish cumulative error [Pritchett] must show that . . . at least two errors were committed in the course of the trial[, and when] considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied [him] a fundamentally fair trial.

Id. at 21 (4) (citation and punctuation omitted).

But here, although we have determined that the trial court committed errors in admitting the other-acts evidence under Rule 404 (b), we have considered them cumulatively and concluded that it is highly probable that any error in admitting the other-acts evidence did not contribute to the verdict finding Pritchett guilty of malice murder. Thus, these errors could not have "so infected the

47

jury's deliberation that they denied [Pritchett] a fundamentally fair trial." *Lane*, 308 Ga. at 21 (4). With respect to the multiple claims of ineffective assistance of counsel, we have determined that Pritchett has failed to carry his burden of showing deficient performance by his trial counsel. Accordingly, Pritchett cannot show cumulative prejudice in this case sufficient to warrant a new trial. See *Scott v. State*, 309 Ga. 764, 771 (3) (d) (848 SE2d 448) (2020) ("Assessing cumulative prejudice is necessary only when multiple errors have been shown.").

*Judgment affirmed. All the Justices concur.*

Decided October 4, 2022.

Murder. Gilmer Superior Court. Before Judge Gober, pro hac vice.

*Frances C. Kuo*, for appellant.

*B. Alison Sosebee, District Attorney, Marianne M. Gelakoska, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Eric C. Peters, Assistant Attorney General*, for appellee.